**Troy A. ASHMUS, et al., Plaintiffs,**

v.

**Arthur CALDERON, et al., Defendants.**

**No. C 96–1533 TEH.**

United States District Court,
N.D. California.

June 14, 1996.

110 Stat. 1214, to the State of California. Plaintiffs [1] contend that California has failed to comply with the Act's so-called "opt-in" provisions, as set forth in the newly created Chapter 154 of the Judicial Code. Accordingly, plaintiffs contend, the expedited review and other provisions of Chapter 154 do not, and cannot, apply to petitions brought under 28 U.S.C. § 2254 by prisoners challenging California judgments of death.

On May 24, 1996, the Court issued a short order granting plaintiffs' request for provisional class certification, declaratory relief, preliminary injunctive relief, and to proceed *in forma pauperis.* The Court also granted defendants' request for a temporary stay of the preliminary injunction and denied defendants' expedited motion to dismiss. In accordance with Fed.R.Civ.P. 65 and the dictates of Fed.R.Civ.P. 52(a), this memorandum opinion and order sets forth the findings of fact and conclusions of law that constitute the grounds for the Court's May 24 order.

Good cause appearing, and for the reasons discussed below, the Court also hereby GRANTS defendants' request for a partial five (5) day stay of this order, and MODIFIES its provisional certification of the class to exclude the approximately 50 death row inmates in California whose sentences were affirmed on direct appeal prior to June 6, 1989.

Michael Laurence, Sternberg, Sowards & Laurence, San Francisco, CA, for Plaintiffs.

Morris Beatus, CA State Attorney General's Office, San Francisco, CA, for Defendants.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

THELTON E. HENDERSON, Chief Judge.

### INTRODUCTION

This case concerns the applicability of Title I of the Antiterrorism and Effective Death Penalty Act of 1996 ("Act"), Pub.L. 104–132,

### FINDINGS OF FACT

#### 1. The Parties

Plaintiff Ashmus is a prisoner who has been sentenced to death by the State of California. The California Supreme Court affirmed his conviction and sentence on December 5, 1991. *People v. Ashmus,* 54 Cal.3d 932, 2 Cal.Rptr.2d 112, 820 P.2d 214 (1991), *rehearing denied,* Jan. 29, 1992, *cert. denied,* 506 U.S. 841, 113 S.Ct. 124, 121 L.Ed.2d 79 (1992). On February 17, 1993, plaintiff instituted federal habeas proceedings challenging his conviction and death sentence by filing an Application for Appointment of Counsel and a Request for Stay of

---

**1.** Troy A. Ashmus is the only named plaintiff in this action. Because the Court has already provisionally certified the class, however, and for convenience sake, the Court will use the plural form, plaintiffs, unless referring specifically to Mr. Ashmus.

Execution in *Ashmus v. Calderon,* No. 93–0594–TEH (N.D.Cal.). *See* Special Requirements for Capital Habeas Corpus Petitions, Local Rule 296–8(b) (condemned prisoner's pro se application for appointment of counsel and for temporary stay of execution "shall be deemed to be a petition for writ of habeas corpus with leave having been granted to amend the petition upon appointment of counsel"); *see also McFarland v. Scott,* 512 U.S. 849, –––– ––––, 114 S.Ct. 2568, 2572–73, 129 L.Ed.2d 666 (1994) (concluding that a " 'post-conviction proceeding' within the meaning of [21 U.S.C.] § 848(q)(4)(B) is commenced by the filing of a death row defendant's motion requesting appointment of counsel for his federal habeas corpus proceeding").

Plaintiff, whose current counsel was appointed in August 1995, had anticipated filing his "finalized petition" for writ of habeas corpus by August 2, 1996.[2] Magistrate Judge Joan Brennan recently vacated this "presumptive" filing date, however, and no date is currently set for the filing of his petition. *Ashmus v. Calderon,* No. 93–0594–TEH (JB) (N.D.Cal. May 24, 1996).

As of April 1, 1996, each of the 438 other members of the proposed plaintiff class had also been convicted and sentenced to death by the State of California, and was awaiting execution. More than a quarter of the proposed class members are without counsel and likely to remain so for some time. By defendants' own admission, "Every inmate who is awaiting appointment of counsel *has* been 'offered' counsel and that offer has been accepted; what is pending is the appointment itself." Defs.' 1st Opp'n Mem. at 16 (emphasis in original); *see also* Pls.' Ex. 5 at A1, Mack Reed, *An Even Longer Wait on Death Row,* L.A. Times, April 3, 1996, at A1, A14 (noting that 128 men and six women on death row are waiting for counsel). Approximately 145 of the proposed class members currently have pending federal habeas proceedings. On average, two to three individuals are added to the proposed class each month.

The four defendants are Arthur Calderon, Warden of San Quentin Prison and the custodian of all male persons sentenced to death and housed at that facility; Teena Farmon, Warden of the Central California Women's Facility, and custodian of all female persons sentenced to death and housed at that facility; James Gomez, Director of the California Department of Corrections; and Daniel Lungren, California Attorney General. Plaintiffs have sued each defendant in his or her official capacity and have alleged that each defendant acts under color of law.

### 2. The Statute

On April 24, 1996, President Clinton signed into law the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104–132, 110 Stat. 1214. Title I of the Act, entitled "Habeas Corpus Reform," modifies existing habeas corpus procedures contained in Chapter 153 of the Judicial Code (Title 28), and enacts a new Chapter 154, adding §§ 2261–2266 to Title 28.[3] Chapter 154 offers a system of expedited review and other "benefits"[4] to states that qualify under either of two so-called "opt in" procedures: (1) the "post-conviction" procedure provided for in § 2261 or (2) the "unitary review" procedure provided for in § 2265.

The Act, which largely codified a 1989 proposal by the Ad Hoc Committee on Federal Habeas Corpus in Capital Cases,[5] essen-

---

**2.** " 'Finalized petition' [] refer[s] to the petition filed by retained or appointed counsel." Local Rule 296–5.

**3.** Unless otherwise indicated, all further statutory references are to Title 28.

**4.** The benefits to opt-in states include a six-month statute of limitations on the filing of federal habeas corpus petitions, limitations on amendments to petitions and their factual development, and limitations on federal courts' power to review the merits of constitutional claims and order appropriate relief. 28 U.S.C. §§ 2263–2264.

Moreover, for qualifying states, capital habeas matters must be reviewed under strict, statutorily prescribed time limits, and must be "given priority by the district court and by the court of appeals over all noncapital matters." § 2266(a).

**5.** Ad Hoc Committee on Federal Habeas Corpus in Capital Cases, Report on Habeas Corpus in Capital Cases, 45 Crim.L.Rep. (BNA) 3239 (Sept. 27, 1989) ("Powell Committee Report"); *see also* House Comm. on the Judiciary, Effective Death Penalty Act of 1995, H.R.Rep. No. 23, 104th Cong., 1st Sess., at 16 ("House Report") ("Proposed 28 U.S.C. 2256 [codified as § 2261] sets

tially establishes a "quid pro quo arrangement under which states are accorded stronger finality rules on federal habeas review *in return for strengthening* the right to counsel for indigent capital defendants." House Report at 10 (emphasis added). The Act thus seeks to create an incentive for states to provide competent counsel throughout state collateral review, recognizing that such counsel is "crucial to ensuring fairness and protecting the constitutional rights of capital litigants." Powell Committee Report at 3240; *see also* House Report at 8; 137 Cong.Rec. at S3220 & S3222 (March 13, 1991) (Section-by-Section Analysis of the Comprehensive Violent Crime Control Act of 1991) [hereinafter "1991 Analysis"].[6] In exchange for adequately providing such competent counsel, Congress offered states a potentially available mechanism for ensuring expedited and final review of federal habeas corpus petitions. 1991 Analysis, 137 Cong. Rec. at S3220 & S3222; House Report at 8 & 10; Powell Committee Report at 3239.

### 3. The Harm Caused by Defendants' Conduct

In public statements both prior to and since enactment of Title I, throughout this litigation, and in other cases pending before federal courts in California, defendants and their agents have consistently and vigorously maintained that California qualifies for Chapter 154's benefits under § 2265's unitary review procedure. Defendants claim that California satisfies § 2265 by virtue of a "comprehensive scheme of interlocking, cross-implementive provisions." The qualifying mechanism, defendants claim, became effective on June 6, 1989, and consists primarily of the following: (1) Cal.Gov't Code § 68511.5 (effective Jan. 1, 1984), (2) Rule 39.5 of the "Rules of Practice and Procedure Adopted by the Judicial Council and the Supreme Court" ("Rules of Court") (effective Jan. 1, 1983), (3) Rule of Court 76.5 (effective Jan. 1, 1985), (4) Section 20 of the Standards

of Judicial Administration Recommended by the Judicial Council (effective Jan. 1, 1985), (5) the California Supreme Court Statement of Internal Operating Practices and Procedures ("IOPP") (Adopted Summer 1985, Revised December 1989, and in 1995), (6) the California Supreme Court Statement of Policies Regarding Cases Arising From Judgements of Death (the "June 6, 1989 Policies") (adopted June 6, 1989), and (7) *In re Clark*, 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729 (1993). Accordingly, defendants have threatened to invoke chapter 154 in all federal court proceedings involving members of the proposed class.

Absent judicial relief from this Court, defendants' threats to invoke Chapter 154's expedited review provisions will effectively cause plaintiffs to forfeit rights to which they are entitled under Chapter 153. As the Court has previously noted,

> Without a judicial determination of the rights and responsibilities of the parties to this action, prisoners under sentence of death by the State of California must necessarily guess as to whether and how Chapter 154 may constrain their ability to seek redress in the federal courts for deprivations of their constitutional rights. The absence of a clear and uniformly applicable determination that the State of California has or has not complied with the provisions of Chapter 154 forces all condemned prisoners to choose between the risk of unknowingly relinquishing their entitlement to federal habeas corpus procedures under Chapter 153, or the risk of unknowingly forfeiting any enforcement of their federal constitutional rights.
>
> ¶.
>
> California's eligibility to proceed under Chapter 154 literally may have life or death consequences for plaintiff and members of the proposed class ...

*Ashmus v. Calderon,* No. C96–1533 TEH at 4–5 (N.D.Cal. May 24, 1996).

---

out the basic conditions for states to 'opt in' to the Powell Committee procedures, by extending appointment of counsel for indigent capital defendants to state collateral proceedings."). Although the House issued this report in connection with the proposed 1995 Act, the relevant

portions of the proposed 1995 Act are identical to the legislation signed into law.

**6.** The relevant provisions of the 1991 Act are also identical to the legislation signed into law.

Plaintiffs will be forced to forfeit their rights under Chapter 153 as a direct result of the uncertainty over Chapter 154's applicability created by defendants' assertions. Defendants' statements during the course of this litigation leave little room for doubt that, absent judicial relief, they will continue to make such threats and assertions.

As a practical matter, defendants' assertions would thus secure for the State the benefits of the Act, regardless of whether California actually provides the competent counsel that states are required by Congress to give plaintiffs as a quid pro quo for receiving such benefits. For these reasons, defendants' threats effectively deprive plaintiffs of their rights under chapter 153, and, arguably, under the Due Process Clause as well.[7]

As the Supreme Court recently observed, erroneously denying a state prisoner use of a first "federal habeas petition is a particularly serious matter, for that dismissal denies the petitioner the protections of the Great Writ entirely, risking injury to an important interest in human liberty." *Lonchar v. Thomas,* —— U.S. ——, ——, 116 S.Ct. 1293, 1299, 134 L.Ed.2d 440 (1996) (reversing the Eleventh Circuit's order vacating the lower court's stay of a state execution). Effectively forcing state prisoners to file hasty habeas corpus petitions, without providing the quid pro quo benefits of competent counsel, similarly risks injury to this important interest in human liberty.

To be sure, as the *Lonchar* Court recognized, Congress has the power to establish statutes of limitation on habeas filings. *Id.* at ——, 116 S.Ct. at 1301. By enacting Chapter 154, Congress has exercised that power to make a six month limitation *potentially* applicable to states. Presumably, Congress could have made Chapter 154 applicable to all states, regardless of their provision of competent counsel to state prisoners for state collateral review. However, Congress has not done so, and it has entrusted to the federal judiciary the responsibility and obligation for determining whether Chapter 154 applies to a given state.[8]

Defendants suggest that now that Congress has enacted such potentially applicable limitations, the Court would inappropriately impose hardship on California were it to exercise its equitable powers to enjoin California from receiving the benefits of the Act. However, the Supreme Court's cautioning against judicial action which "lightly" imposes a statute of limitation in the absence of congressional action, *Lonchar,* —— U.S. at ——, 116 S.Ct. at 1301, counsels equally against this Court allowing defendants to effectively impose a potentially applicable statute of limitation where it concludes that California does not qualify for such an application.

As the Supreme Court emphasized, "given the importance of a first federal habeas peti-

---

**7.** Defendants' make the unrealistic and infeasible suggestion that plaintiffs can readily avoid any harm by acting as if Chapter 154 does apply in California, and then, if a Court subsequently determines that Chapter 154 does not apply, withdrawing any hastily filed petition and refiling it at a later date. Under such a scenario, plaintiffs' counsel will have to file and then refile piecemeal claims. Counsel will have to start and stop investigation and funding. Counsel will have no idea what time constraints exist with respect to discovery or how to plan a coherent investigation. Counsel will have no idea, in seeking discovery and fashioning an investigation plan, what rules and standards apply to the evidentiary hearing or on what bases relief may be granted. In the Court's view and experience, it is wholly unrealistic and, indeed, unworkable, for counsel to proceed effectively in such a fashion.

**8.** *See, e.g.,* Powell Committee Report at 3242 ("[I]t is more consistent with the federal-state balance to give the States wide latitude to estab-

lish a mechanism that complies ... The final judgments as to the *adequacy* of any system for the appointment of counsel [ ], however, rests ultimately with the federal judiciary.... [T]he adequacy of the system—as opposed to the competency of particular counsel—can be settled through litigation.") (emphasis in original); 1991 Analysis, 137 Cong.Rec. at S3220 ("The latitude afforded to the states in defining specific standards of counsel competence is also desirable ... [However], *[a]t a minimum,* the immediate benefits to defendants would include the requirement that states electing these procedures *actually appoint* counsel for the collateral proceedings, and these states focus on an [sic] articulate standards of competence for such appointments.") (emphasis added); *id.* at 3222 (pointing out that proposed § 2261, codified in the 1996 Act as § 2265, "would *extend the chapter to states with adequate* unitary review procedures") (emphasis added).

tion, it is particularly important that any rule that would deprive inmates of all access to the writ should be both clear and fair." *Id.* at ——, 116 S.Ct. at 1302. The same is true of California's allegedly comprehensive scheme, and of this Court's review of that scheme. As discussed below, however, California's scheme falls far short of this standard. Indeed, as the Ninth Circuit recently emphasized, the June 6, 1989 Policies that defendants contend constitute the core of the alleged scheme are "difficult to articulate," have been "applied only randomly," and were, at least until *In re Clark,* 855 P.2d 729 (1993), neither clear, nor well-established. *Morales v. Calderon,* 85 F.3d 1387, 1393 (1996) ("express[ing] no opinion as to whether the California Supreme Court has sufficiently narrowed the timeliness standards or applied them consistently since *Clark*").

Whether, as plaintiffs assert, defendants' effective deprivation of their rights under Chapter 153 constitutes "deprivation" within the meaning of 42 U.S.C. § 1983 raises difficult legal questions. However, as a factual matter, the Court finds that defendants' threats have caused plaintiffs to forgo their statutory rights and that, absent relief from this Court, defendants' threats will continue to cause such injury.

Any doubts as to whether defendants' assertions are causing plaintiffs to forego their rights under Chapter 153 are readily relieved by consideration of what plaintiffs' position in this regard would be if defendants had, instead, stated that they planned to establish a unitary review procedure that would allow them in the future to invoke Chapter 154's benefits. In such a situation, plaintiffs would not face the unconscionable dilemma discussed above, and would continue to exercise their statutory and constitutional rights. While Defendants certainly have a fundamental First Amendment right to express

their views in this regard, the Court concludes that the manner in which they have done so has put plaintiffs in a very different position with respect to their habeas corpus rights than they would be if defendants had not done so.[9]

### 4. *Procedural Background*

In the thirty days following plaintiffs' filing of this action on April 24, 1996, the Court held three hearings and received six rounds of briefing on the matter. On May 2, at the close of the show cause hearing on plaintiff's application for a "Temporary Restraining Order, Temporary Declaratory Relief, and Preliminary Injunctive Relief," the Court granted plaintiffs' application for a temporary restraining order ("TRO").[10] On May 13, at the close of the hearing on plaintiff's application for a preliminary injunction, the Court modified and extended the TRO for an additional ten days. *See Ashmus v. Calderon,* No. C96–1533 TEH (N.D.Cal. May 15, 1996) (Order Modifying and Extending TRO). And on May 24, one day after the hearing on plaintiff's expedited motion for provisional class certification, defendants' expedited motion to dismiss, and other matters raised in the parties' supplemental briefs, the Court issued a brief order addressing the outstanding issues presented by the parties.

In addition, on May 31, defendants filed an Ex Parte Application for Partial 5–Day Stay of Final Order and Judgment, for the sole purpose of facilitating defendants' anticipated application to the Ninth Circuit for a stay pending appeal. On June 3, Defendants filed an Ex Parte Application for Partial Stay of Final Order and Judgment Pending Appeal, asking the Court partially to stay its order, in lieu of defendants' seeking such a stay from the Ninth Circuit.

In the event that any of the following Conclusions of Law are deemed to be Find-

---

9. Thus, for instance, it is clear that plaintiffs' rights have not been harmed by recent statements of elected officials regarding California's present efforts to reform its mechanism for providing competent counsel to capital defendants pursuing collateral review, even though the State presumably hopes to opt-in to Chapter 154 via these reforms. *See* Mike Lewis, *Capital Appeals Overhaul Starts With Money,* Daily J., May 28, 1996, at 1.

10. In the week following this Court's issuance of the TRO, defendants sought emergency stays from both the Ninth Circuit and the United State Supreme Court, and applied for an emergency writ of mandamus to the Ninth Circuit. Each of these requests was summarily denied.

ings of Fact, they are incorporated by reference as Findings of Fact.

### CONCLUSIONS OF LAW

In the event that any of the foregoing Findings of Fact are deemed to be Conclusions of Law, they are incorporated by reference as Conclusions of Law.

## I. PRELIMINARY ISSUES

 Defendants have raised a number of threshold questions concerning the Court's power to hear this case, including challenges to plaintiffs' standing, the ripeness of their claims, and the existence of a cognizable cause of action. As the Supreme Court has explained, these issues are related to, but analytically distinct from the threshold question of jurisdiction.

> Thus it may be said that *jurisdiction* is a question of whether a federal court has the power, under the Constitution or laws of the United States, to hear a case, see *Mansfield, C. & L.M.R. Co. v. Swan,* 111 U.S. 379, 384, 4 S.Ct. 510, 512, 28 L.Ed. 462 (1884); *Montana–Dakota Utilities Co. v. Northwestern Public Serv. Co.,* 341 U.S. 246, 249, 71 S.Ct. 692, 694, 95 L.Ed. 912 (1951); *standing* is a question of whether a plaintiff is sufficiently adversary to a defendant to create an Art. III case or controversy, or at least to overcome prudential limitations on federal-court jurisdiction, see *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975); *cause of action* is a question of whether a particular plaintiff is a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court; and *relief* is a question of the various remedies a federal court may make available.

*Davis v. Passman,* 442 U.S. 228, 239 n. 18, 99 S.Ct. 2264, 2274, 60 L.Ed.2d 846 (1979) (emphasis in original).

### A. Jurisdiction

 The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. Section 1331 confers jurisdiction upon the Court over "all civil actions arising under the Constitution, laws, or treaties of the United States." A lawsuit "arises under" federal law if (1) federal law creates the cause of action, or (2) "the resolution of the dispute depends upon the validity, construction, or effect of federal law, so long as the federal question is a real and substantial issue." *City Nat. Bank v. Edmisten,* 681 F.2d 942, 945 (4th Cir.1982). Plaintiffs seek a declaratory judgment that Chapter 153, rather than the expedited provisions of Chapter 154, governs federal review of his state court conviction and death sentence. Thus, they have alleged facts sufficient to confer jurisdiction under either prong of this test: The Declaratory Judgment Act creates their cause of action, *see Samuels v. Mackell,* 401 U.S. 66, 70, 91 S.Ct. 764, 766, 27 L.Ed.2d 688 (1971) (declaratory judgment is "essentially an equitable cause of action"), and the dispute depends upon the construction and effect of the 1996 Act.

The Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3), because, as discussed below, plaintiffs have sufficiently alleged a cause of action under 42 U.S.C. § 1983.

### B. Standing

 Article III requires a plaintiff to be sufficiently adversary to a defendant to create an actual case or controversy. A plaintiff must show that he has personally suffered some actual or threatened injury as a result of the conduct challenged in the lawsuit, that the injury can be fairly traced to the challenged actions, and that the injury is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992).

 Plaintiff Ashmus and each member of the plaintiff class satisfy these requirements. As noted above, plaintiffs are suffering "actual" injury because defendants have asserted, and, absent judicial relief, will continue to assert falsely that Chapter 154 governs plaintiffs' ability to file and pursue federal habeas proceedings. Because of the uncertainty created by defendants' assertions, plaintiff Ashmus will be forced to comply with Chapter 154 and to structure his habeas litigation accordingly. Other

members of the plaintiff class will be similarly affected. The fact that the provisions of Chapter 154 could not directly apply to plaintiff until his "finalized" petition is filed at some point in the future is no more of a bar to standing than it is to ripeness. *See, e.g., New York v. United States,* 505 U.S. 144, 175, 112 S.Ct. 2408, 2428, 120 L.Ed.2d 120 (1992) (rejecting ripeness objections to New York's challenge of a statutory provision that, three and one-half years in the future, would require it to take title to low-level radioactive waste on the grounds that "New York must take action now in order to avoid the take title provision's consequences"). Thus, plaintiffs are suffering "actual" injury, and that injury can be fairly traced to defendants actions. Accordingly, plaintiffs satisfy Article III's case or controversy requirement.[11]

▌ Defendants challenge to plaintiffs' standing focuses almost entirely on the fact that the six-month statute of limitations created by Chapter 154, *see* 28 U.S.C. § 2263(a), which defendants believe "began running on April 24, 1996, as to plaintiff and all other death row inmates whose judgments were affirmed on or after June 6, 1989,"[12] expires after August 2, 1996, the presumptive filing deadline for plaintiff Ashmus at the time that he filed the instant action.[13] However, defendants ignore the fact that plaintiff Ashmus must be afforded the right to understand the consequences of filing such a petition. Plaintiff must know, prior to drafting the finalized petition, whether 28 U.S.C. § 2264's limitations on federal courts' substantive review of habeas petitions ultimately will apply to the Court's review of his constitutional claims. He must also know whether to file a petition, as ordered by this Court, that contains exhausted and unexhausted claims. Finally, plaintiff must know whether § 2266's rigid time limitations for adjudication of his petition apply.

### C. Ripeness

▌ The basic purpose of the ripeness doctrine "is to prevent the courts, through

avoidance of premature adjudication, from entangling themselves in abstract disagreements ..." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). To achieve this purpose, the doctrine sets forth a "twofold" analysis, requiring the Court to balance "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515. Both parts of this balancing test strongly favor the Court's resolution of the present dispute.

▌ The first part of the test examines the extent to which the issues are sharply focussed. Where, as here, the issue for analysis is, as defendants' acknowledge, "a virtually pure question of law," the issues are generally considered to be sufficiently focussed. *Id.; see also Thomas v. Union Carbide Agr. Prods. Co.,* 473 U.S. 568, 581, 105 S.Ct. 3325, 3333, 87 L.Ed.2d 409 (1985); *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 300–01, 99 S.Ct. 2301, 2309–10, 60 L.Ed.2d 895 (1979) (noting that in such cases, postponement serves no purpose); *id.* at 303–04, 99 S.Ct. at 2311–12 (noting that, by contrast, postponement is appropriate where precise factual circumstances will affect constitutional analysis). That some of the plaintiffs may be able to exercise control over some of the harm alleged (e.g., by filing petitions prior to the deadline) does not alter this conclusion. *Id.* at 303–05, 99 S.Ct. at 2311–12; *Clements v. Fashing,* 457 U.S. 957, 961–62, 102 S.Ct. 2836, 2842–43, 73 L.Ed.2d 508 (1982).

Plaintiffs similarly satisfy the second prong of the ripeness test, the hardship factor. "The most important aspect of the hardship determination is a clear recognition that a decision of legal relationships often should be available before irrevocable commitments are made." 13A Charles

---

**11.** Defendants do not dispute that plaintiffs satisfy the redressability prong of standing.

**12.** Defs.' Supp.Briefing at 7 n. 5.

**13.** Although this filing deadline has since been vacated, plaintiff cannot rely on this fact to establish that he had standing when he filed this action.

Alan Wright, Arthur R. Miller, and Edward H. Cooper, Federal Practice and Procedure § 3532.4, at 167 (2d ed. 1984). As noted above, plaintiffs have convincingly demonstrated to the Court that, absent judicial relief, they will need to make such commitments with regard to their litigation resources and strategies. The impact of defendants' conduct on plaintiffs is thus "sufficiently direct and immediate to render the issue appropriate for judicial review at this stage." *Abbott*, 387 U.S. at 152, 87 S.Ct. at 1517.

Defendants' ripeness challenge rests primarily on their statute of limitations argument, rejected above, and on their belief that, regardless of Chapter 154's applicability, the Act's revised standards of review will apply to plaintiff Ashmus based on the Act's amendments to Chapter 153. *See* Act, Pub.L. 104–132, § 104(3)–(4), 110 Stat. 1219 (revising 28 U.S.C. § 2254(d)–(e)). Plaintiffs persuasively contest the latter point and request that,

> to ensure that an appellate court does not misunderstand this Court's view of the "standing" and "ripeness" issues raised by defendants and the scope of the relief requested, this Court should declare that the amendments to Chapter 153 do not apply to plaintiff Ashmus and the approximately 144 other California death row inmates

who invoked federal habeas jurisdiction prior to April 24, 1996.

Pls.' Reply to Class Cert. at 3 n. 2.

■ For the reasons set forth in plaintiffs' First Reply, and in the thorough retroactivity analysis in *Wilkins v. Bowersox*, 933 F.Supp. 1496, 1502–1506 (W.D.Mo., 1996),[14] the Court agrees that the relevant provisions of the Act, § 104, do not apply retroactively. Accordingly, the Court holds that § 104's amendments to 28 U.S.C. § 2254 do not render the present controversy unripe.

Nonetheless, the Court rejects plaintiffs' suggestion that it should therefore declare Chapter 153, either in whole, or in part, inapplicable to plaintiffs. Plaintiffs' complaint does not explicitly pray for such relief. In the absence of such a prayer, the Court does not believe that such relief is warranted.[15]

### D. Cause of Action

■ "The concept of a 'cause of action' is employed specifically to determine who may judicially enforce the statutory rights or obligations." *Davis v. Passman*, 442 U.S. 228, 239, 99 S.Ct. 2264, 2274, 60 L.Ed.2d 846 (1979). The key question is whether a particular plaintiff is a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court. The answer "depends not on the quality or extent

**14.** *See also, e.g., Williams v. Calderon*, 83 F.3d 281, 286 & n. 2 (9th Cir.1996) (noting that "the Act does not provide an effective date for the general habeas provisions [i.e., Chapter 153]" and assuming, "without deciding, that section 2253(c)(2) of the Act does not apply retroactively ..."); *Warner v. United States*, 926 F.Supp. 1387, 1390 (E.D.Ark.1996) (holding that amendments to § 2255 do not apply retroactively); *United States v. Trevino*, 1996 WL 252570 n. 1 (N.D.Ill. May 10, 1996) (same); *Centanni v. Washington*, 1996 WL 251438 at *1 (N.D.Ill. May 8, 1996) (expressing doubt that amendments to Chapter 153 apply retroactively); *Schlup v. Bowersox*, No. 4:92CV443–JCH at 17 (E.D.Mo. May 2, 1996) (holding that Congress did not intend the amendments to § 2254 to apply retroactively); *But see Leavitt v. Arave*, 927 F.Supp. 394, 398 (D.Id. 1996) (concluding that applying amended versions of §§ 2244, 2253, and 2254 to pending cases would not have retroactive effect); *Bean v. Calderon*, No. CIV S–90–0648 WBS/GGH at 7 (E.D.Cal. May 8, 1996) (applying amended

§ 2254 to a pending case without discussing its retroactivity); *Williams v. Calderon*, No. CV. F–89–160–REC–P, at 5–7, 9, 16–17 (E.D.Cal. April 29, 1996) (holding, in the alternative, that certain provisions of Chapter 153 apply retroactively), *affirmed on other grounds, Williams v. Calderon*, 83 F.3d 281 (9th Cir.1996).

**15.** Concededly, plaintiffs' complaint and moving papers manifest their assumption that Chapter 153 would not apply retroactively. Defendants' ripeness challenge similarly manifests defendants' assumption that Chapter 153 did apply retroactively to pending cases. Accordingly, to the extent that the retroactivity of Chapter 153 impacts the ripeness issue, the Court is obligated to resolve the issue in determining the justiciability of the instant action. However, with respect to Chapter 153's retroactivity, plaintiffs have failed to explain why the Court is similarly obligated to exercise its discretionary jurisdiction to grant the declaratory relief they requested in subsequent briefing.

of [plaintiffs'] injury, but on whether the class of litigants of which petitioner is a member may use the courts to enforce the right at issue. The focus must therefore be on the nature of the right petitioner asserts." *Id.* at n. 18.

■ The Court concludes that plaintiffs fall within the class of litigants whom Congress intended to confer rights upon via the Declaratory Judgment Act. *See Golden State Transit v. City of Los Angeles,* 493 U.S. 103, 119, 110 S.Ct. 444, 455–56, 107 L.Ed.2d 420 (1989) (Kennedy, J., dissenting); *Samuels v. Mackell,* 401 U.S. 66, 70, 91 S.Ct. 764, 766–67, 27 L.Ed.2d 688 (1971) (declaratory judgment is "essentially an equitable cause of action"); Fed.R.Civ.P. 57, 1937 Advisory Committee Notes ("The existence or nonexistence of any right … may be declared."). Unquestionably, plaintiffs also fall within the class of people whom Congress intended to confer rights upon under the habeas corpus provisions of Chapters 153 and 154.

■ Whether plaintiffs also have stated a cause of action cognizable under 42 U.S.C. § 1983 presents a more difficult question. Plaintiffs contend that the existence of a § 1983 cause of action in this case is controlled by a straightforward application of *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). *Steffel* and its progeny, *see, e.g., Ohio Civil Rights Comm'n v. Dayton Christian Schools,* 477 U.S. 619, 625 n. 1, 106 S.Ct. 2718, 2722 n. 1, 91 L.Ed.2d 512 (1986); *Carey v. Population Services Int'l,* 431 U.S. 678, 683 n. 3, 97 S.Ct. 2010, 2015 n. 3, 52 L.Ed.2d 675 (1977); *Doran v.*

*Salem Inn, Inc.,* 422 U.S. 922, 930–32, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975); *Fordyce v. Seattle,* 55 F.3d 436, 440 (9th Cir.1995), involved threatened prosecution or administrative action under a state or local law claimed by plaintiff to be unconstitutional. In each case, the Court held that the fact that state courts might, in the event of prosecution, find the state law unconstitutional did not prevent the threatened prosecution from qualifying as state action creating a federal cause of action pursuant to 42 U.S.C. § 1983. Thus, it is clear that in appropriate circumstances, the threats of state officials to assert an unlawful legal position can give rise to a cause of action under § 1983.

■ Focussing on the nature of the challenged state action, defendants have pointed out several reasons why these cases are potentially distinguishable from the instant case. The Court recognizes that applying the principles underlying *Steffel* to the instant case represents a novel application. However, the Court believes that defendants have misperceived the relevance of these cases to the instant action. The relevant focus is not the nature of state action,[16] but the nature of the harm that *Steffel* and other courts have held to be cognizable under § 1983.

> [T]he Supreme Court has mandated that Section 1983 be "'broadly construed against all forms of official violation of federally protected rights.'" *Dennis v. Higgins,* 498 U.S. 439, 444, 111 S.Ct. 865, 869, 112 L.Ed.2d 969 (1991), *quoting Monell v. New York City Dept. of Social*

---

16. Plaintiffs have adequately alleged the presence of state action, as defendants, at one point at least, seemed to concede. *See* Defendants' 2d Opp.Mem. at 4 ("[Plaintiff] observes that state officials 'act under color of state law' when they litigate, a proposition we do not dispute.") Defendants subsequently cited to *Rosas v. Brock,* 826 F.2d 1004 (11th Cir.1987), for the proposition that any relevant conduct of theirs in this case is action "under color of federal law."

In *Rosas,* the State of Florida entered into a contractual agreement with the federal government to administer the Disaster Unemployment Assistance Program. Pursuant to the federal agreement, state employees reviewed unemployment applications, applied federal regulations, and determined that Mr. Rosas was ineligible for

federal aid. Noting that "the challenged action by state employees is *nothing more* than the application of federal rules," the Eleventh Circuit concluded that "the *federal involvement* in those cases is *so pervasive* that the actions are taken under color of federal and not state law." *Id.* at 1007 (emphasis added). Here, however, the involvement of the federal judiciary has been triggered by state officials' independent assertions of the state's eligibility under Chapter 154. As noted above, defendants' conduct thus constitutes the heart of the dispute. Accordingly, "the state cannot be characterized as a purely passive actor so as to preclude Section 1983 liability." *Mitson v. Coler,* 670 F.Supp. 1568, 1576 (S.D.Fl.1987); *see also Martin v. Heckler,* 773 F.2d 1145, 1154 (11th Cir.1985) (en banc).

*Services,* 436 U.S. 658, 700–701, 98 S.Ct. 2018, 2040–41, 56 L.Ed.2d 611 (1978). Threatened harm that has not yet occurred, but that will occur unless judicial relief is afforded is enough to support a civil rights claim. *See, e.g., Wright v. Roanoke Redevelopment & Housing Authority,* 479 U.S. 418, 431–32, 107 S.Ct. 766, 774–74, 93 L.Ed.2d 781 (1987).

*Thorsted v. Gregoire,* 841 F.Supp. 1068, 1083 (W.D.Wa.1994), *aff'd,* 75 F.3d 454 (9th Cir. 1996). Accordingly, the Court believes that the mere fact that another actor—whether it's the state court in the threatened prosecution cases, or the federal court in the instant case—may limit the harm caused by defendants' conduct does not defeat a cause of action under 42 U.S.C. § 1983.

In *Steffel,* the uncertainty caused by state officials' threats to prosecute plaintiff under an allegedly unconstitutional statute caused plaintiff to forego his First Amendment rights to free speech. In *Thorsted,* the uncertainty created by state officials' threats to enforce an allegedly unconstitutional term limits measure caused plaintiffs to forego rights secured by the First and Fourteenth Amendments, as well as the Qualifications Clause. In the instant case, the uncertainty created by defendants' threats is causing plaintiffs to forego their rights, under Chapter 153, not to be executed without a federal court's determination that their conviction and sentence does not offend the U.S. Constitution. The denial of these rights "is a particularly serious matter . . ., risking injury to an important interest in human liberty." *Lonchar v. Thomas,* — U.S. —, —, 116 S.Ct. 1293, 1299, 134 L.Ed.2d 440 (1996).

Defendants have appropriately cautioned the Court that in extending well-established precedent to issues of first impression, courts should be mindful of the need to establish a principled basis on which to limit that extension. This case readily provides such a limiting principle. As the Supreme Court has repeatedly emphasized over the past two decades, *see, e.g., Gardner v. Florida,* 430 U.S. 349, 357–58, 97 S.Ct. 1197, 1204–05, 51 L.Ed.2d 393 (1977), and as Congress' enactment of Chapter 154 vividly exemplifies, "death is [ ] different." *Cf.* 13A Wright, Miller, & Cooper, Federal Practice and Procedure § 3532.5 at 185 (2d Ed.1984) (noting, in the related context of ripeness, that courts' "willingness to protect against even prospective burdens of compliance is enhanced if especially valuable interests seem to be at stake"). Thus, while the cognizability of plaintiffs' § 1983 cause of action is not entirely free from doubt, the Court concludes that, in the context of this case, plaintiffs have raised sufficiently serious questions to warrant the preliminary injunctive relief requested.

## II. CLASS CERTIFICATION

On May 6, 1996, pursuant to Civil Local Rules 7–10 and 23–2, plaintiffs moved on an expedited basis to have their motion for provisional class certification heard on May 13, together with the preliminary injunction hearing already scheduled for that time. In response to defendants' vigorous objection that a May 13 hearing would not allow sufficient time to undertake the "rigorous analysis" required under Rule 23, *see General Telephone of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982), the Court set the class certification hearing for ten days later, on May 23. The Court notes however, that defendants' brief analysis of the requirements of Rule 23(a) and their failure even to mention, in their brief, two of the bases proposed by plaintiff to maintain this action under Rule 23(b), belies their suggestion that anything less than the "normal" 35–day briefing schedule provided for by this Court's local rules would prejudice their ability to address the merits of class certification.[17] *See* Defs.' Opp'n to Exp.Mot. at 4–5.

---

17. Defendants' opposition to class certification focussed largely on the standing of named plaintiff Troy Ashmus to bring this suit, and on the ripeness of his claim. Defendants are free to present any arguments they deem appropriate, and standing and ripeness are, of course, threshold concerns in every suit. The jurisdictional arguments addressed in the first two-thirds of defendants' opposition to class certification, however, had already been addressed and explored in the parties' earlier oral and written arguments.

Plaintiff seeks to certify a class consisting of all prisoners who have been sentenced to death by the State of California and are currently awaiting execution. To qualify for class certification, plaintiff must first satisfy the four prerequisites enumerated in Fed. R.Civ.P. 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy. In addition to these prerequisites, plaintiff must satisfy one of the bases for maintaining a class action listed in Rule 23(b).

 Plaintiff bears the initial burden of demonstrating that Rule 23's requirements have been met. *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 448 (N.D.Cal.1994); *see also, Blackie v. Barrack,* 524 F.2d 891, 901 (9th Cir.1975) (noting that because class certification inevitably involves some speculation, plaintiff need only present "sufficient information [for the court] to form a reasonable judgment"), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). The district court has broad discretion in determining whether to certify a class, however, and its determination "should not be overturned on review unless it is shown that the district court abused its discretion." *Spectrum Financial Companies v. Marconsult, Inc.*, 608 F.2d 377, 382 (9th Cir.1979), *cert. denied,* 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980). The Court concludes that plaintiff has met his burden and that provisional certification is warranted in this case.

### A. Rule 23(a)

#### 1. Numerosity

 Plaintiffs seek to certify a class consisting of all prisoners who have been sentenced to death by the State of California. By its express terms, Chapter 154 applies, in qualifying states, to all members of the class who petition for habeas corpus in federal courts. 28 U.S.C. § 2261(a) ("This chapter shall apply to cases arising under section 2254 brought by prisoners in State custody who are subject to a capital sentence."). Plaintiffs assert that the class contains approximately 439 persons, with approximately two unknown members being added to the class each month.[18] Defendants do not dispute plaintiffs' numerical estimates. Rather, they contend that the appropriate class consists only of the approximately 52 death row inmates who, like plaintiff, have state death judgments that became final after June 6, 1989, and who have not yet filed federal habeas corpus petitions. Having thus redefined the class, defendants claim that plaintiffs fail to satisfy the numerosity requirement because death row inmates in California are easily located, easily identified, and "are engaged in litigation or will be." Defs.' Opp'n to Class Cert. at 10–11.

Defendants correctly note that the *current* members of the class are easily identified and easily located. However, for several reasons, their claim that class representation is thus inappropriate lacks merit. First, solely by virtue of the undisputed fact that two to three "unnamed and unknown future" persons are being added to the class each month, joinder in this case is "inherently impracticable." *Jordan v. Los Angeles County,* 669 F.2d 1311, 1320 (9th Cir.), *vacated on other grounds,* 459 U.S. 810, 103 S.Ct. 35, 74 L.Ed.2d 48 (1982). Second, while there is no exact numerical formula for determining whether a class is sufficiently numerous, *see, e.g., Garcia v. Gloor,* 618 F.2d 264, 267 (5th Cir.1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981), the Ninth Circuit has indicated that even by defendants' own estimate of 52 class members, the numerosity requirement is satisfied here. *Jordan,* 669 F.2d at 1319 (reversing district court's denial of class certification and noting that "we would be inclined to find the numerosity requirement in the present case satisfied *solely* on the basis of the number of ascertained class members, i.e., 39, 64, and 71") (emphasis added). Third, given the undisputed fact that more than a quarter of the proposed class members are without

---

Defendants' comments are also at odds with their efforts to get this case to the appellate level as soon as possible and their unwillingness, at the May 3 hearing, to stipulate to a period longer than 10 days for the TRO.

**18.** Pls.' Compl ¶ 20; Defs.' 1st Opp'n at 7 n. 1.

counsel and likely to remain so for some time,[19] the likelihood that these individuals will engage in litigation against defendants at some point in the future hardly renders their joinder in this action practicable.

Defendants' efforts to redefine the class similarly lack merit. With one exception, these efforts are based on distinctions between class members that are irrelevant to the requirements of Rule 23. First, as discussed below, all members of the proposed class share common questions of law and of fact. Second, defendants' claim that the proposed class members whose cases are currently pending in state court have no cause of action and therefore should not be included in the class runs directly counter to Supreme Court precedent. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 2153, 40 L.Ed.2d 732 (1974) ("In determining the propriety of a class action, the question is not whether … the plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.") (quoting *Miller v. Mackey International,* 452 F.2d 424, 427 (5th Cir.1971)). In addition, defendants ignore the fact that Chapter 154's applicability will affect these individuals' decisions about how best to preserve federal habeas review of constitutional claims, when and whether to seek certiorari, and whether they are entitled to "reasonable litigation expenses." Third, defendants' suggestion that prisoners who have already filed federal habeas petitions should be excluded from the class, presumably because the filing deadline will not apply to them, ignores the remaining provisions of Chapter 154 that Congress expressly made applicable to pending capital habeas petitions. Death Penalty Act, Pub.L. No. 104–132, § 107(c), 110 Stat. 1214, 1226 (1996) (Chapter 154 "shall apply to cases pending on or after the date of enactment of this Act.").

Defendants have raised one important distinction, however, that the Court's May 24 order did not sufficiently take into account. During the course of this litigation, defendants have conceded that California's alleged comprehensive scheme does not apply to death row inmates whose judgments became final prior to June 6, 1989. Accordingly, defendants argued, these inmates will "not be subjected to any 'unlawful' argument by state officials about the application of federal law." Defs.' Opp'n to Class Cert. at 10.

Based on plaintiffs' contentions that these concessions contradicted some of the very assertions by defendants that gave rise to this action, and on the Court's own concerns that defendants' concessions might not be legally enforceable in subsequent actions, the Court provisionally included such persons in the certified class. Upon reconsideration, however, the Court concludes that the roughly 50 persons whose judgments were affirmed prior to June 6, 1989, should *not* be included in the class. Accordingly, and good cause appearing, the Court hereby MODIFIES the provisionally certified class to exclude such individuals.

### 2. *Commonality*

■■■■■ The existence of common questions of law alone, or of fact alone, satisfies the commonality requirement. *Cottrell v. Virginia Elec. & Power Co.,* 62 F.R.D. 516, 519 (E.D.Va.1974). The requirement is met by the alleged existence of a common practice by defendants; the defendants' actions need not affect each member of the class in the same way. *Arnold,* 158 F.R.D. at 448. Whether Chapter 154 applies in California and whether defendants' assertions in this regard are harming death row inmates in California are the central questions presented by this case. Standing alone, these questions, which plaintiffs have demonstrated are *common to all members of the class,* satisfy the commonality requirement. *Nehmer v. U.S. Veterans' Admin.,* 118 F.R.D. 113, 117 (N.D.Cal.1987) ("Courts have frequently certified classes whose members share a common threat of future harm.").

Plaintiffs' complaint and brief list a litany of additional factual and legal questions that are common to members of the class. Pls.' Compl. ¶¶ 21–22; Pls.' Class Cert.Mot. at 6 (e.g., whether California has a unitary review procedure; whether California has a statute or rule providing for standards of competency for the appointment of counsel in unitary

---

**19.** Defs.' 1st Opp'n Mem. at 16; Pls.' Ex. 5 at A1.

review procedures; whether defendants have threatened to assert that Chapter 154 applies to all or some members of the class; whether, if California has the appropriate mechanisms and rules required by 28 U.S.C. § 2265, it has broadly failed to comply with the specific requirements of those mechanisms and rules; and whether California has entered an order by court of record appointing counsel for all indigent death row inmates who have accepted offers of counsel).

Defendants have not specifically objected to the commonality of any of these questions. Rather, they have simply asserted that because "plaintiff has no existing case or controversy with defendants on the issue of Chapter 154's application[,] [h]e therefore presents no questions of law and fact common to or typical of the proposed class." Defs.' Opp'n to Class Cert. at 12–13. As noted above, the Court has concluded that plaintiff has standing. The Court hereby finds that the questions of law and of fact identified by plaintiffs are indeed common to all members of the plaintiff class. Accordingly, the Court holds that plaintiffs have satisfied the commonality requirement.

### 3. Typicality

The typicality requirement is satisfied if the "class representative[s] ... possess the same interest and suffer the same injury as the class members." *East Texas Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977). Typicality does not require that the named plaintiff's claims be identical to those of the other class members. Moreover, a finding of commonality will ordinarily support a finding of typicality. *Falcon,* 457 U.S. at 157 n. 13, 102 S.Ct. at 2370 n. 13. Aside from the jurisdictional arguments previously rejected by the Court, defendants have failed to identify any manner in which the class representative's claims or defenses are atypical. The Court finds that the class

representative possesses the same interests and suffers the same injury as other class members. Accordingly, plaintiffs have satisfied the typicality requirement.

### 4. Adequacy

Two factors are considered in determining whether a case satisfies the requirement of fair and adequate representation. First the class representative's interests must be coextensive with and not antagonistic to the interests of the remainder of the class. Second, plaintiff's counsel must be fully competent to prosecute the action as a class action. *Jordan,* 669 F.2d at 1322. "[T]he attorney's zeal, competence, and experience are factors relevant to the District Court's exercise of discretion" in the appointment of counsel. *Harriss v. Pan American World Airways, Inc.,* 74 F.R.D. 24, 43 (N.D.Cal.1977).

Defendants do not appear to contest that plaintiffs have satisfied this requirement. The Court finds that the named plaintiff's interests in challenging the applicability of Chapter 154 are identical to the interest of the remainder of the proposed class.[20] Moreover, plaintiffs' counsel are fully competent to prosecute this case in a class action. Numerous state and federal courts, including this Court, have appointed the attorneys for plaintiffs to represent indigent prisoners under sentence of death. The Court finds that plaintiff has satisfied the adequacy requirement.

### B. Rule 23(b)

In addition to satisfying the prerequisites listed in Rule 23(a), plaintiff must demonstrate that this action falls within one of the three categories enumerated in Rule 23(b). So far as relevant here, Rule 23(b) is satisfied where:

---

20. At oral argument, defendants did appropriately note that the Court should not assume that all members of the proposed class will necessarily oppose application of Chapter 154's requirements to their habeas corpus petitions. Defendants may be correct, but this speculation hardly suffices to show that class certification is unwarranted. *See, e.g., Probe v. State Teachers' Retirement System,* 780 F.2d 776, 781 (9th Cir.) (noting that the fact that some class members may believe a challenged state retirement plan is legal does not create "conflict" sufficient to render class certification improper), *cert. denied,* 476 U.S. 1170, 106 S.Ct. 2891, 90 L.Ed.2d 978 (1986).

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Fed.R.Civ.P. 23(b).

 Here, plaintiffs seek to maintain the action under either Rule 23(b)(1) or 23(b)(2). To satisfy subsection (b)(2), two factors must be present: (1) the defendants' action or refusal to act must be generally applicable to the class; and (2) injunctive and declaratory relief must be requested for the class. Plaintiffs have clearly demonstrated that both factors are present. First, defendants conduct, the assertions that California satisfies the opt-in provisions of Chapter 154, affect each member of the class, and indeed, have been directed at each member of the proposed plaintiff class. *See Christman v. American Cyanamid Co.*, 92 F.R.D. 441, 453 & n. 34 (N.D.W.Va.1981) (defendants conduct is "generally applicable" to the class if the defendant has adopted a pattern of activity that is likely to be the same as to all members of the class; "defendant need not have acted directly against each member of the class"). Second, plaintiffs have alleged, and the Court has concluded, that injunctive and declaratory relief are appropriate with respect to the class as a whole. The Court notes that Rule 23(b)(2) was specifically drafted to facilitate vindication of civil rights, particularly where, as here, that vindication can be remedied through injunctive relief. *See* Rule 23, Advisory Committee's Note to the 1966 Amendments; *Coley v. Clinton*, 635 F.2d 1364, 1378 (8th Cir.1980).

 This action is also appropriately maintained under both bases listed in subparagraph (b)(1). Defendants did not address either basis in their papers, although they did assert at oral argument that plaintiffs failed to satisfy the requirements. The Court disagrees. Prosecution of separate actions by or against plaintiffs would create precisely the risk of inconsistent adjudications and the resultant incompatible standards of conduct for defendants that the Rule was expressly designed to prohibit. Indeed, at the May 13 hearing, defendants argued that the Court should refrain from enjoining defendants for this very reason: so that other district courts would have the opportunity to reach a different conclusion regarding the applicability of Chapter 154. Similarly, Rule 23(b)(1)(B) is satisfied here because adjudications with respect to individual members would, "as a practical matter, be dispositive of the interests of the other class members." Fed.R.Civ.Pro. 23(b)(1)(B). For instance, were a district court to find that California qualified under Chapter 154, nonparty class members would, as a practical matter, have no choice but to comply with 28 U.S.C. § 2263(a)'s filing deadline. If the Ninth Circuit or the Supreme Court subsequently held otherwise, the nonparty class members would have effectively foregone their rights under Chapter 153 without any opportunity to litigate the matter.

### C. Legitimacy of Class Action in This Case

 At the May 23 hearing, defendants for the first time raised two additional arguments in opposition to class certification. First, defendants claimed that class certification is usually used for a "terminal purpose." In the instant case, by contrast, defendants claim that plaintiffs' sole purpose in seeking class certification is momentarily to "disrupt" all pending federal capital habeas proceedings in California to resolve Chapter 154's applicability, and then to send the cases back to the district courts where they are currently pending. Second, and relatedly, defendants suggest that by granting

plaintiffs' requested relief, the Court would somehow inappropriately or illegitimately deprive other federal district courts in California of their independent duty and responsibility to address the applicability of Chapter 154.

Defendants have neither briefed nor cited authority for either proposition. With respect to the first objection, the Court notes that, even assuming, arguendo, that class certification is only appropriate where the suit will terminate the controversy between the parties,[21] this case certainly satisfies that requirement. Plaintiffs have asked the Court to declare whether Chapter 154 applies to all state prisoners sentenced to death in California. Whether the Court answers affirmatively or negatively, its answer will terminate the controversy over this question.

With regard to defendants' second objection, the Court is mindful of the limitations that Article III and Congress have imposed upon its jurisdiction. The Court is also sensitive to both the appearance and the reality of any action that might somehow illegitimately or inappropriately impose its view on its sister district courts. At the same time, however, the Court bears an obligation to resolve questions properly brought before it by litigants.

 In this case, plaintiffs have availed themselves of two devices created by Congress to help litigants in appropriate circumstances: the "remedial arrow" of the Declaratory Judgment Act, see Wilton v. Seven Falls Co., — U.S. —, —, 115 S.Ct. 2137, 2143, 132 L.Ed.2d 214 (1995), and the expediency and economy of Rule 23's various mechanisms for bringing a class action, see Falcon, 457 U.S. at 155, 102 S.Ct. at 2369. The Court believes that it is obligated to resolve the question as plaintiffs have pre-

sented it. The Court has done so, to the best of its ability. If the Court is mistaken, the appellate courts will correct it. In the interim, the Court's decision may constrain the ability of other co-equal district court judges to decide the issue differently. Far from being an illegitimate or inappropriate exercise of its power, however, the Court believes that it was obligated to reach such a decision.[22]

In the end, defendants' second objection simply restates their repeatedly expressed belief that Troy Ashmus should have brought this controversy before the Court through a different vehicle (i.e., by way of a motion in his federal habeas proceedings currently before the Court in Ashmus v. Calderon, C 93–0594 TEH). Had plaintiff done so, the Court's decision would not have directly affected other district courts' resolution of Chapter 154's applicability to California. However, plaintiff did not bring the motion as defendants would have liked. Instead, plaintiff brought this action. The Court is required to resolve the question as it in fact was presented, not as defendants wish it had been presented.

### D. Conclusion

For the reasons discussed above, and good cause appearing, plaintiffs shall provisionally maintain this matter as a class action on behalf of a class consisting of the following persons:

All prisoners who have been sentenced to death by the State of California and are currently awaiting execution pending resolution of their state and federal challenges to their state convictions and sentences, except those such persons whose convic-

---

21. The Supreme Court's decision in *Eisen* strongly suggests that no such additional requirement exists. *See Eisen, supra,* 417 U.S. at 178, 94 S.Ct. at 2153. (1974) ("In determining the propriety of a class action, the question is ... whether the requirements of Rule 23 are met.") (internal citations omitted); *see also Garcia,* 618 F.2d at 267 ("Whether a class should be certified depends *entirely* on whether the proposal satisfies the requirements of Fed.R.Civ.P. 23.") (emphasis added).

22. Although neither party briefed the issue, the Court notes that its jurisdiction under the Declaratory Judgment Act is discretionary. *Employers Reinsurance Corp. v. Karussos,* 65 F.3d 796 (9th Cir.1995). After reviewing the factors raised in *Karussos,* however, the Court has concluded that, at the very least, exercise of its discretionary jurisdiction is proper in this case; indeed, the Court believes, failure to exercise its jurisdiction in this case would arguably be an abuse of that discretion.

tions and sentences were affirmed on direct appeal prior to June 6, 1989.

Plaintiff Troy A. Ashmus shall be the named class representative. The Court shall retain the power to modify, amend, or revoke the class certification throughout the pendency of the action.

## III. STATUTORY FRAMEWORK

### A. Overview

As noted above, Chapter 154 provides two "opt-in" procedures, the so-called "post-conviction" procedure (§ 2261) and the "unitary review" procedure (§ 2265). Defendants concede, and the Court has previously held, that California does not qualify under § 2261's "post-conviction" procedure. California's eligibility for Chapter 154's benefits thus depends on whether the state has complied with the provisions of § 2265.[23]

The threshold question for determining compliance with § 2265 is whether the state has created "a 'unitary review' procedure." If a state has a unitary review procedure, then it qualifies under § 2265 if (1) "the State establishes by rule of its court of last resort or by statute a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in the unitary review proceedings," § 2265(a); (2) "The rule of court or statute [ ] provides standards of competency for appointment of such counsel," *id.; and* (3) the State also properly establishes the requisite mechanism for offering and appointing counsel pursuant to § 2265(b). Failure to comply with any of these mandatory requirements is fatal to a state's ability to opt-in under § 2265.

### B. Does California Authorize Unitary Review?

■ "A 'unitary review' procedure means a State procedure that authorizes a person under sentence of death to raise, in the course of direct review of the judgment, such claims as could be raised on collateral attack." § 2265(a). Focussing on the term "unitary *review*," plaintiffs interpret this provision to mean that the state must allow collateral issues to be reviewed in the same proceeding or proceedings as the direct appeal. In other words, plaintiff claims, unitary review means a "single procedure affording identical substantive review and disposition of direct review and collateral claims." Pls.' Mem. at 9.

■ The plain language of the statute, however, provides that the State procedure need only "*authorize* [ ] a person under sentence of death to *raise*, in the course of direct review of the judgment, such claims ..." § 2265(a) (emphasis added). "When a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstances, is finished." *Estate of Cowart v. Nicklos Drilling,* 505 U.S. 469, 475, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992).

■ Several references in the legislative history also support the view that California has the type of unitary review procedure that would potentially qualify states for the bene-

---

**23.** Plaintiffs contend that § 2261 sets forth basic requirements that also apply to states opting in under § 2265's unitary review procedure. Viewed in isolation, the language of § 2261(a) appears to support this interpretation: "This chapter shall apply to cases arising under section 2254 brought by prisoners in State custody who are subject to a capital sentence. It shall apply *only if* the provisions of subsections (b) and (c) are satisfied." 28 U.S.C. § 2261(a) (emphasis added). Congress' use of the term "only" suggests that independent of any requirements for unitary review established in § 2265, *any* opt-in procedure must satisfy § 2261(b) and (c) to qualify the state for the benefits of Chapter 154.

However, the Court rejects this reading, for two reasons. First, it would render the entirety of § 2265 mere surplusage, in direct contraven-

tion of § 2265(a)'s provision that "*This chapter shall apply*, as provided in this section, in relation to a State unitary review procedure" that complies with the additional requirements of section 2265. Second, it is impossible for a case to simultaneously satisfy the requirements of § 2261(b) and the requirements of § 2265(a). The Court's reading is also supported by the fact that § 2261(a)'s "only if" language comes from the Powell Committee's original 1989 report, whereas § 2265's unitary review procedure was added later to "extend the potential application of the [Powell Committee's] proposed procedures to states having 'unitary review' systems in capital cases." 1991 Analysis, 137 Cong.Rec. at S3221–22. Accordingly, except insofar as § 2261(c) is expressly incorporated by § 2265(b), the Court holds that § 2261 is inapplicable here.

fits of the Act.[24] The utility of this legislative history is undermined, however, by the fact that many of the same speakers made statements supporting plaintiffs' view.[25] This very inconsistency demonstrates precisely why legislative history is never dispositive, and is only resorted to when congressional intent is not clear from the face of the statute. Here, congressional intent is clear from the face of the statute. The procedure, to qualify, need only authorize persons under sentence of death to raise such claims as could otherwise be raised collaterally.

California authorizes capital petitioners to raise such claims during the course of direct review. *See* June 6, 1989 Policies, Timeliness Standards 1–1 to 1–1.2; *see also, e.g., In re Neely*, 6 Cal.4th 901, 906, 922, 26 Cal.Rptr.2d 203, 864 P.2d 474 (1993); *People v. Mayfield*, 5 Cal.4th 142, 197, 209, 19 Cal.Rptr.2d 836, 852 P.2d 331 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2780, 129 L.Ed.2d 892 (1993). Indeed, although plaintiffs have presented evidence that the California Supreme Court rarely *reviews* collateral claims together with the direct appeal, exercises seemingly standardless discretion in allowing consolidation of the two types of claims, and does not

authorize payment for appointed counsel to investigate all collateral claims, plaintiffs do not seriously dispute that persons sentenced to death are authorized to raise such claims during the pendency of the direct appeal.[26]

Accordingly, the Court holds that California has a unitary review procedure, as that term is defined in the Act. As explained below, however, the Court also concludes that California's alleged comprehensive scheme fails to satisfy the remaining requirements of section 2265, for several independent reasons.

## C. Does California have a qualifying mechanism for appointment and compensation of competent counsel?

California's alleged "mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel" expressly precludes compensation for raising certain collateral issues. Appellate counsel's

> duty to investigate [factual and legal grounds for the filing of a habeas petition] is *limited* to investigating potentially meritorious grounds for relief that have come

---

**24.** House Report at 18 ("Proposed 28 U.S.C. § 2261 [codified as § 2265] contains provisions that make the Powell Committee procedures *potentially* applicable to states, such as California, which have adopted unitary review systems in capital cases that involve review of collateral claims concurrently with direct review of the judgement.") (emphasis added); 1991 Analysis, 137 Cong.Rec. at S3221 (March 13, 1991) ("California, for example, has adopted a unitary review procedure for capital cases by rule of its Supreme Court"); Daniel F. Lungren, *Report on Death Penalty Habeas Corpus Reforms*, 137 Cong. Rec. S8716, S8717 (June 26, 1991) ("Lungren Report") ("California has adopted a unitary review procedure in capital cases."); *see also* Defs.' Ex. N. at 10, Minority Report of A.B.A. Task Force on Habeas Corpus Reform Co–Chairman Malcolm M. Lucas, *reprinted in* Ira P. Robbins, "Toward A More Just and Effective System of Review in State Death Penalty Cases", 40 *Am.U.L.Rev.* 1, 200 (1990) ("[The California Supreme Court] promulgated standards ... requiring appellate counsel in capital cases to promptly 'investigate factual and legal grounds for the filing of a petition for a writ of habeas corpus' and to file such petition 'without substantial delay' (concurrent with the appeal, if possible).") (quoting June 6, 1989 Policies, Timeliness Standard 1).

**25.** *See, e.g.,* Lungren Report, 137 Cong.Rec. at S8717 (The proposed Act "[a]uthorizes [a] state unitary procedure in which appeal and collateral review are handled in [a] *single proceeding* ..."); 1991 Analysis, 137 Cong.Rec. at S3221–22 ("Proposed 28 U.S.C. § 2261 [codified as § 2265] ... would extend the potential application of the proposed procedures to states having 'unitary review' systems for capital cases ... [that] *combine* the normal functions of direct review and collateral attack in a 'unitary review' procedure.") (emphasis added); *see also,* 137 Cong. Rec. S18665, S18674 (Nov. 27, 1991). Interestingly, defendants adopted the identical view in another case in this district. "Section 2265 requires the State to establish a mechanism for appointing counsel with the authority to handle a direct appeal and collateral review in a *single proceeding*." Pls.' Ex. 7, *Odle v. Calderon* C88–4280 CAL (N.D.Cal.), Resp.Brief at 5 n. 3 (filed April 26, 1996) (emphasis added).

**26.** In response to the Court's question whether any unresolved factual issues prevent the Court's issuance of final declaratory relief, however, plaintiffs did allege that they can show "that although the state court may not make it 'official,' it routinely has effectively decided the appeal before the habeas petition is filed." Pls.' Supp.Brief at 15.

to counsel's attention in the course of preparing the appeal. It does not impose on counsel an obligation to conduct, *nor does it authorize* the expenditure of public funds for, an unfocused investigation having as its object uncovering all possible factual bases for a collateral attack on the judgment.

June 6, 1989 Policies, Timeliness Standard 1–1. (emphasis added). In other words, appointed counsel's duty "is limited [ ] to an investigation of potentially meritorious grounds for habeas corpus which have come to counsel's attention in the course of *preparing the appeal.*" *In re Clark,* 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 531, 855 P.2d 729, 751 (1993) (emphasis added). Only when the facts already "have come to counsel's attention suggesting that a basis for habeas corpus relief may exist," will the policies provide compensation. *Id.* n. 19. The investigation must then be limited to the "specific facts" that are then "known to counsel." *Id.* 21 Cal.Rptr.2d at 531–32, 855 P.2d at 751–52.

As the *Clark* Court explained, the policies thus limit " 'fishing expeditions' whose purpose is solely to discover if any basis for collateral attack on a presumptively valid judgment can be found." *Id.* n. 19. However sensible that limitation may be, the Supreme Court has thus construed its own policies as failing to provide indigent condemned inmates with counsel who is authorized or compensated even to investigate, let alone raise, potential collateral claims beyond those that are knowable by reference to the four corners of the appellate record. Even then, appointed counsel is constrained to investigate only the discrete facts and potential issues that are discernable from the record.

These limitations run afoul of § 2265(a)'s express requirement that the unitary review procedure authorize and provide compensation for capital defendants to "raise, in the course of direct review of the judgement, *such claims as could be raised* on collateral attack." § 2265(a) (emphasis added). The limitations also create an objectively deficient standard for the performance of counsel ap-

pointed to seek collateral relief in satisfaction of Chapter 154's quid pro quo arrangement.[27] As the Ninth Circuit has noted, the meaningful assistance of counsel in collateral proceedings is important precisely because it is necessary to enable prisoners to "assert *all* possible violations of his constitutional rights" and thus avoid the risk of defaulting claims that could have reasonably been discovered through diligent investigation. *Brown v. Vasquez,* 952 F.2d 1164, 1167 (9th Cir.1991) (emphasis added), *cert. denied,* 503 U.S. 1011, 112 S.Ct. 1778, 118 L.Ed.2d 435 (1992).

The Court's conclusion draws additional support from *Morales v. Calderon,* 85 F.3d 1387 (1996), a Ninth Circuit decision filed after the close of briefing in this case. As the Ninth Circuit emphasized, the June 6, 1989 Policies just discussed are "difficult to articulate," have been "applied only randomly," and were, at least until *In re Clark,* neither clear, nor well-established. *Morales,* 85 F.3d at 1390–92. While the issue before the Ninth Circuit concerned the timeliness of a petition filed under the Policies, the Court also referred specifically to the duties in question here, which are set forth in Timeliness Standard 1–1. *Id.* at 1390.

The well-established need in this area of the law for rules that are clear and fair also provides some support for plaintiffs' argument that California's mechanism is inadequate because the comprehensive scheme is not created by a single rule or statute. As plaintiffs note, § 2265(a) expressly requires the state to establish the appropriate mechanism by "rule of its court of last resort" or by "statute"; "The rule of court or statute must provide standards of competency." Each of these references is in the singular, as are the analogous references in § 2261(b). Defendants, by contrast, argue that "nothing in the language of the 1996 Act supports plaintiff's suggestion that Congress expected or much cared whether the several tasks ... are accomplished by a single passage of printed words or a multitude of such passages." Defs.' 2d Opp'n at 8. The Court notes that

---

**27.** Although Congress intended to give states wide latitude in developing such standards, the final decision as to the adequacy of these stan-

dards rests squarely with the federal judiciary. *See supra* note 8.

the Act's language, if narrowly construed, belies this claim. Defendants' interpretation would essentially require the Court to re-write the relevant passage ("if the State establishes, *by rule of its court of last resort or by statute* [,] a mechanism....") to eliminate the underlined clause between "establishes" and "mechanism." Nonetheless, the Court is hesitant to embrace plaintiffs' hypertechnical interpretation of the Act, particularly given the existence of other, independent grounds for its holding.

■■■■ The Court does conclude, however, that even if Congress did not intend that the mechanism must be enacted by a single statute or rule, it undoubtedly did intend to require that the state affirmatively create a system, not come forth with a post hoc rationalization. *See, e.g.,* 1991 Analysis, 137 Cong.Rec. at S3220 ("*At a minimum,* the immediate benefits to defendants would include the requirement that states ... *focus on an[d] articulate* standards of competence ...") (emphasis added). As discussed in the next section, it is readily apparent that California failed to do so. Indeed, the state's competency guidelines, which defendants claim adequately take into account the need for specialized habeas expertise, were articulated and recommended in 1985. It was not until 1989, however, that capital counsel were required to investigate possible habeas claims. *In re Clark,* 21 Cal.Rptr.2d at 531, 855 P.2d at 751 ("The [June 6, 1989] Policies did, *for the first time,* impose an express obligation on counsel representing appellants in capital cases to investigate possible bases for habeas corpus.") (emphasis added). Thus, it is clear that the 1985 guidelines did not "focus on and articulate standards of competence" for counsel to raise collateral claims.

### D. Does California Have a Rule of Court or Statute that Provides Standards of Competency for Appointment of Counsel in Unitary Proceedings?

■■■ Section 2265(a) provides that "[t]he rule of court or statute must provide standards of competency for the appointment of such counsel." Defendants argue that Cali-

fornia satisfies this requirement by virtue of the interaction between § 20 of the Standards of Judicial Administration Recommended by the Judicial Council, and Rules of Court 39.5 and 76.5. Section 20, entitled "Guidelines for Appointment of Counsel in Criminal Appeals," provides that each "appellate court, when establishing and maintaining lists of qualified counsel for appointment in criminal appeals as required by rule 76.5 *should* follow the guidelines in this section ..." § 20(a) (emphasis added). Section 20(c) provides:

> The Supreme Court *should* maintain a list of attorneys for appointment in death penalty cases, based on the following minimum qualifications: (1) active practice of law for four years in the California state courts or equivalent experience; (2) attendance at three approved appellate training programs, including one program concerning the death penalty; (3) completion of seven appellate cases, one of which involves a homicide; and (4) submission of two appellants' opening briefs written by the attorney, one of which involves a homicide, for review by the court or administrator.

(emphasis added). These are the only standards of competence identified by defendants.

Section 20 fails to satisfy § 2265(a)'s requirements for three independent reasons: it (1) is not a rule of court or statute; (2) does not impose any binding or mandatory standards; and (3) does not require counsel to have any experience or competence in bringing habeas petitions.

First, section 20, together with the Introductory Statement to the Judicial Council's "rules, standards, and orders," make clear that section 20 is not a rule of court. The Introductory Statement points out that "[t]he Judicial Council is established under article VI, section 6, of the Constitution, and is given various powers and responsibilities to improve the administration of justice." 1996 Cal.Rules of Court at 1 (West 1996). Under its power to "*adopt rules* for court administration," the Judicial Council has adopted certain Rules of Court, which "have the force of law." *Id.* (emphasis added). In addition, and by contrast, under its power to "*make*

---

*recommendations* to the courts," the Judicial Council has adopted certain nonmandatory standards, *id.* (emphasis added), such as section 20. The nonmandatory nature of such standards is repeatedly emphasized in the Introductory Statement, and in section 20 itself:

> The nonmandatory nature of the standards is indicated by the use of 'should' instead of the mandatory 'shall'. Standards make recommendations on practice and procedure, express goals that courts and judges are urged to try to attain, and state guidelines for discretionary action. Even though courts are not obligated to comply with these recommendations, goals, and guidelines, courts should consider them . . .

*Id.* at 1; *see also, e.g.,* section 20(a) ("Each appellate court . . . should follow. . . ."); section 20(b) ("Each Court of Appeal should maintain . . ."); section 20(c) ("The Supreme Court should maintain . . .").

Second, and relatedly, section 20 does not impose any binding or mandatory standards on the California Supreme Court. Nor have defendants provided any indication that the Supreme Court has followed § 20(c)'s recommendation and adopted these standards as binding upon itself. Defendants attempt to brush aside this objection by asserting that the Act does not require that the standards be "inexorably mandatory." [28] Defs.' 2d Opp'n at 10. However, the language of the Act and the legislative history discussed above demonstrate that Congress deemed the provision of competent counsel at all stages of proceedings as essential to the quid pro quo tradeoff envisioned under chapter 154. Congress' express and repeated mandate that any qualifying mechanism must provide standards for the appointment of counsel would be meaningless if the decision whether to apply those standards was left to the complete discretion of the court or the guideline administrator.

Defendants do acknowledge that "if and when the supreme court ever finds it necessary to revise its procedures to allow that capital appointments be made on a *standardless* basis, then our review mechanism would no longer comply with the letter or spirit of § 2265." Defs.' May 14, 1996 Supp.Brief at 2 (emphasis in original). The Court agrees, but it also believes that defendants' concession fails to recognize the importance that Congress placed on having mandatory standards. Absent such standards, federal courts would be unable to evaluate the adequacy of a state's mechanism without examining the competency of individual counsel. Such an approach, however, would create the very type of judicial intrusiveness that Congress sought to avoid. *See* Powell Report at

---

**28.** Alternatively, defendants argue that Rules of Court 39.5 and 76.5 somehow render the guidelines mandatory. They do not. Rule 76.5, which governs appointment of counsel in criminal cases, provides in relevant part that "Each Court of Appeal shall maintain at least two lists [of qualified attorneys]. In establishing the lists, the court shall consider the guidelines in section 20 . . ." Rule 76.5(b).

Three points bear mentioning. First, Rule 76.5 only requires the court to *consider* the § 20 guidelines. It does not render the guidelines binding or mandatory. Second, Rule 76.5, by its terms, applies only to criminal appeals, not to habeas proceedings. Habeas corpus petitions are considered to be "*original* proceedings seeking release or modification of custody," not appeals from lower courts. Rule of Court 56.5; *In re Carpenter,* 9 Cal.4th 634, 645, 38 Cal.Rptr.2d 665, 889 P.2d 985 (1995) (noting that California Constitution "grants original subject matter jurisdiction over habeas corpus proceedings to the superior court, the Court of Appeal, and [the Supreme Court]"). Third, Rule 76.5's reference to "Each Court of Appeal" almost certainly does not refer to the state Supreme Court. The only citable decision discussing this section failed to interpret the phrase so broadly. *People v. Hackett,* 36 Cal.App.4th 1297, 43 Cal.Rptr.2d 219, 228 (1st Dist.1995); *but see* Rule of Court 61(d) (noting that for the purposes of rules 61 to 69, "Court of Appeal" shall also mean "Supreme Court.")

Next defendants contend that Rule 39.5 resolves "any conceivable ambiguity" about Rule 76.5's application to the Supreme Court's alleged unitary review procedure. Rule 39.5 provides that "[t]he rules *governing appeals* from the superior court in other criminal cases apply to *appeals* from judgments rendering the penalty of death . . ." (emphasis added). Rule 39.5 does not render Rule 76.5, let alone § 20, binding on the Supreme Court, for two reasons. First, the rules governing appeals, which appear in Chapter I of the Rules, do not include Rule 76.5, which appears in Chapter IV, governing administrative provisions. Second, Rule 39.5 applies only to criminal appeals; it makes no mention of original habeas proceedings, which are governed by Chapter II's Rule 56.5.

3242 ("The final judgments as to the *adequacy* of any system for the appointment of counsel [ ], however, rests ultimately with the federal judiciary.... [T]he adequacy of the system—as opposed to the competency of particular counsel—can be settled through litigation." (emphasis in original); 1991 Analysis, 137 Cong.Rec. at S3222 ("The chapter would apply to such a procedure if it included appointment of counsel *meeting* articulated standards of competence") (emphasis added); *id.* at S3220.

Third, section 20(a) contains no mention of original habeas proceedings and § 20(c) requires no minimum experience whatsoever in habeas proceedings. Defendants conclusorily assert that the standards do not need to address counsel's qualifications in habeas matters, because "appellate counsel and habeas counsel are one and the same; the competency standards are thus 'unitary' as well." Defs.' 2d Opp'n at 12. Congress almost certainly did intend that the competency standards be "unitary," but such an intention undermines rather than supports defendants' claim that the state's competency standards need not consider counsel's qualifications or experience to raise "off the record" claims. The plain language of the Act evinces Congress' concern with the ability of competent counsel to address collateral claims. *See, e.g.,* § 2265(a) (The State must establish a "mechanism for the appointment, compensation, and payment of reasonable litigation expenses of *competent* counsel in the unitary review proceedings, including expenses relating to the litigation of *collateral* claims in the proceedings. The rule of court or statute must provide standards of *competency* for the appointment of *such* counsel.") (emphasis added); § 2261(b) (mechanism must provide for "competent counsel in State *post-conviction* proceedings [and] ... The rule of court or statute must provide standards of competency for the appointment of *such* counsel.") (emphasis added); *see also* 1991 Analysis, 137 Cong.Rec. at S3220 ("At a minimum, ... these states [must] focus on an[d] articulate standards of competence for such" collateral proceedings). As noted above, however, the Judicial Council promulgated and articulated the recommended standards more than four years before the California Supreme Court established the policies that require appointed counsel to pursue collateral remedies.

Finally, the Court rejects defendants' assertion that competence in criminal appeals necessarily encompasses competence in bringing habeas petitions. As Judge Godbold, of the Eleventh Circuit, has noted, "[t]he average trial lawyer, no matter what his or her expertise, doesn't know any more about habeas than he does about atomic energy..... [Habeas] is the most complex area of the law I deal with." *"You Don't Have To Be a Bleeding Heart," Representing Death Row: A Dialogue Between Judge Abner J. Mikvah and Judge John C. Godbold,* Human Rights, Winter 1987, at 22, 24; *see also Lonchar v. Thomas,* —— U.S. ——, ——, 116 S.Ct. 1293, 1302, 134 L.Ed.2d 440 (1996) (recognizing the "common practice of substitution specialized capital counsel for habeas" as an essential consideration in the development of "fair and effective" habeas reform); Report of A.B.A. Task Force on Habeas Corpus Reform *reprinted in* Ira P. Robbins, *Toward A More Just and Effective System of Review in State Death Penalty Cases,* 40 Am.U.L.Rev. 1, 71 & n. 79 (1990) (listing several sources noting the singular difficulty and complexity of habeas corpus law).

Accordingly, the Court concludes that California does not comply with § 2265(a)'s requirement that "[t]he rule of court or statute must provide standards of competency for the appointment of such counsel."

### E. Does California's Mechanism Provide the Required Offer and Appointment of Counsel?

Finally, California fails to make a bona fide offer of counsel as required by § 2265(b) & 2261(c). By defendants' own admission, "Every inmate who is awaiting appointment of counsel *has* been 'offered' counsel and that offer has been accepted; what is pending is the appointment itself." Defendants' 1st Opp.Mem. at 16 (emphasis in original). The failure to appoint counsel after an indigent prisoner has accepted such an offer contravenes the express requirement of

§ 2261(c), as incorporated by § 2265(b), that the state's procedure "must provide for ... appointment of one or more counsels to represent the prisoner *upon a finding* that the prisoner is indigent and accepted the offer ..." (emphasis added); *see also* 1991 Analysis, 137 Cong.Rec. at S3220 ("*At a minimum,* the *immediate* benefits to defendants would include the requirement that states electing these procedures *actually appoint* counsel for the collateral proceedings ...") (emphasis added).

## IV. RELIEF

### A. Declaratory Judgement

■ "In a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a); *American States Ins. Co. v. Kearns,* 15 F.3d 142, 143 (9th Cir.1994). The Court has concluded that this case presents an actual controversy that is within its jurisdiction. Accordingly, the Court has the discretionary power to issue a declaratory judgment.

■ Declaratory relief is favored where, as here, alternative remedies are less effective or unavailable. Contrary to defendants assertions, case-by-case adjudication of Chapter 154's applicability is not a better or more effective remedy. Case-by-case adjudication not only will involve a multiplicity of suits litigating identical legal and factual issues, but also will do nothing to alleviate the uncertainty giving rise to plaintiffs' claim. The risk that Chapter 154 applies will effectively force plaintiffs whose convictions have been affirmed to file their claims within the six month deadline, possibly resulting in unintentional waiver or inadequate presentation of meritorious claims. This unwitting error might not be remedied in time to stop an execution even if Chapter 154 were later found by a higher court to be inapplicable.

Accordingly, for the reasons discussed above, and good cause appearing, the Court hereby DECLARES that Chapter 154 of Title 28 of the United States Code does not, at the present time, apply to California, because California has failed to comply with the opt-in provisions of 28 U.S.C. § 2261 or § 2265. The Court further declares that the provisions of Chapter 154 are not applicable to the federal habeas corpus proceedings of any members of the provisionally certified class. This declaration shall remain in effect until and unless the State of California demonstrates to this Court that it has complied with the opt-in provisions of 28 U.S.C. § 2261 or § 2265.

### B. Preliminary Injunction

■ In the Ninth Circuit, in order to be entitled to preliminary injunctive relief, a plaintiff must show one of the following:

[E]ither (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in [the plaintiff's] favor.

*EEOC v. Recruit U.S.A., Inc.,* 939 F.2d 746, 752 (9th Cir.1991). "The alternative standards are not separate tests but the outer reaches of a single continuum. Essentially the trial court must balance the equities in the exercise of its discretion." *International Jensen Inc. v. Metrosound U.S.A., Inc.,* 4 F.3d 819, 822 (9th Cir.1993). A grant or denial of a motion for a preliminary injunction lies within the discretion of the district court, and it will be reversed only if the court relied on an erroneous legal premise or otherwise abused its discretion. *Chalk v. U.S. District Court,* 840 F.2d 701, 704 (9th Cir. 1988).

■ Plaintiffs have satisfied both prongs of the test for preliminary injunctive relief. Prior to issuance of the Court's TRO, defendants' threats to invoke Chapter 154's expedited review provisions were causing plaintiffs to forego rights to which they are entitled under Chapter 153. Defendants' assertions during the course of this litigation leave little room for doubt that, absent injunctive relief, they will continue to make such threats and assertions.

As a practical matter, defendants' assertions were securing for the State the benefits of the Act, regardless of whether California actually provides the competent counsel that

Congress required states to give plaintiffs as a quid pro quo for receiving such benefits. For these reasons, defendants' threats were effectively depriving plaintiffs of rights that the Court has declared they are entitled to under Chapter 153, and, arguably, under the Due Process Clause as well. Whether, as plaintiffs assert, this effective deprivation constitutes "deprivation" within the meaning of 42 U.S.C. § 1983 appears to be a difficult question of first impression. However, at the least, plaintiff has raised serious questions in this regard. Given the balance of hardships in this case and the potential life or death consequences at stake, the Court is obligated to resolve any doubts in plaintiffs' favor and to grant a preliminary injunction.

In addition, and independent of 42 U.S.C. § 1983, the Court finds that injunctive relief is necessary and proper to effectuate the terms of its declaratory judgment. Accordingly, the Court may issue injunctive relief pursuant to 28 U.S.C. § 2202. *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 930–32, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975).

For the foregoing reasons, the Court reaffirms its May 24, 1996 order converting the TRO into a preliminary injunction. Accordingly, as indicated in that order, defendants their agents, servants, employees and attorneys, and all those in active concert with them ARE HEREBY RESTRAINED AND ENJOINED from trying or seeking to obtain for the State of California the benefits of the provisions of Chapter 154 of Title 28, United States Code, in any state or federal proceeding involving any class member.

## V. STAY

Defendants have requested a temporary stay of the Court's injunctive relief and provisional class certification, "solely for the purpose of facilitating defendants' anticipated application to the Ninth Circuit for a stay pending appeal." Good cause appearing, and in deference to the important state interests previously recognized by the Court, the Court hereby STAYS the provisional class certification and preliminary injunctive relief for a period of five (5) days. The Court DENIES defendants' alternative request for

this Court to issue a partial stay pending appeal.

## CONCLUSION

For the reasons discussed above, and good cause appearing, it is hereby ORDERED that

(1) Plaintiff's request for provisional class certification is GRANTED;

(2) Plaintiff's request for final declaratory relief is GRANTED;

(3) Plaintiff's request for preliminary injunctive relief is GRANTED; and

(4) Defendants' request for a five (5) day partial stay of the Court's order is GRANTED.

**IT IS SO ORDERED.**