This argument, however, is too speculative as matter of law.

"Under Missouri law, 'to obtain a damage award for lost profits at trial, [Defendant] must produce evidence that provides an adequate basis for estimating lost profits with reasonable certainty. Proof of actual facts which present a basis for a rational estimate of damages without resorting to speculation is required.'" *Polytech, Inc. v. Affiliated FM Insurance Co.*, 21 F.3d 271, 276 (8th Cir.1994)(*quoting Manor Square, Inc. v. Heartthrob of Kansas City, Inc.*, 854 S.W.2d 38, 44 (Mo.Ct.App.1993)); *see also Brown v. McIBS, Inc.*, 722 S.W.2d 337, 341 (Mo.Ct. App.1986) ("The general rule as to recovery of anticipated profits of a commercial business is that they are too uncertain and dependent upon changing circumstances to warrant a judgment for their recovery ."). It is impossible to say with a degree of assurance what contracts Defendant would have procured or how much income any contracts that were procured would have generated. Accordingly, Plaintiff's method of calculation is correct.

In view of the foregoing conclusions, Plaintiff's Motion for Summary Judgment should be granted and this case should be dismissed with prejudice.

**Gary Lee ROLL, Petitioner,**

v.

**Michael BOWERSOX, Respondent.**

No. 98–0136–CV–W–6.

United States District Court,
W.D. Missouri,
Western Division.

Aug. 14, 1998.

---

2. Although Defendant's memorandum in opposition references other representations made by Plaintiff's accountants as to the appropriate amount of business loss allegedly suffered by Defendant, the other figure was based upon a longer period of time. No evidence has been presented that Defendant's business loss exceeded Plaintiff's calculations when properly limited to the thirteen day period in which Defendant's business operations were necessarily suspended.

Michael S. Shipley, Withers, Brant, Igoe & Mullenix, Liberty, MO, Connie M. Francis, Walters, Bender & Strohbehn, P.C., Kansas City, MO, for Plaintiff.

Stacy Anderson, Ass't. MO State Attorney General, Jefferson City, MO, for Defendant.

## MEMORANDUM AND ORDER

SACHS, District Judge.

Petitioner Gary Lee Roll seeks federal habeas corpus review under 28 U.S.C. § 2254 of his murder conviction and subsequent death sentence. Petitioner was charged with three counts of first degree murder, three counts of armed criminal action and one count of first degree robbery. In August 1993 he pled guilty in the Circuit Court of Boone County to all of these charges, without benefit of a plea agreement. The factual basis for the plea, as described by the Missouri Supreme Court is as follows:

After ingesting alcohol, marijuana, and four to six hits of LSD, Gary Lee Roll, David Rhodes, and John Browne decided to rob a drug dealer. Roll supplied each of them with a gun and a knife and drove the three to the home of an alleged drug dealer. When Roll attempted to force open the front door, a child cried out. Rhodes and Browne refused to go inside, so they all returned to Roll's residence.

Later that night, they decided to rob a different drug dealer, Randy Scheper. At about 4:00 a.m., Roll drove to Scheper's house, with Rhodes and Browne. Roll knocked on the door and Scheper's mother, Sherry, answered. Displaying a badge, Roll identified himself as a police officer and ordered her to open the door. When she did, Roll and Rhodes entered. Browne, who knew the family, remained outside, fearing he would be recognized. Inside the house, Roll fatally shot Randy in the head and beat Sherry to death with his gun. Roll (either alone or in concert with Rhodes) fatally stabbed Randy's brother, Curtis. Roll, Rhodes and Browne then left with some marijuana and $215 in cash.

Returning home, Roll cleaned blood and hair from his gun and blood off his knife and clothing. He wrapped the murder weapons and a box of ammunition in a package, which his son buried in the woods behind Roll's house.

In the weeks after the murders, Browne began to fear for his safety. To protect himself, Browne wore a tape recorder during a conversation with Roll about the murders. On the tape, Roll admitted committing the murders and getting rid of the murder weapons. Roll also said that he killed the Schepers because "they knew everybody ... And I figured then they even knew me, because of something that was said in there...." Browne gave the tape to a friend for safekeeping, who in turn gave it to the police.

*State v. Roll,* 942 S.W.2d 370, 373(Mo.), *cert. denied,* —— U.S. ——, 118 S.Ct. 378, 139 L.Ed.2d 295 (1997).

Some two months after the plea, on November 5, 1993, the Circuit Court commenced petitioner's sentencing hearing. On November 16, 1993, the court sentenced petitioner to death for each of the three counts of murder, to 30 years imprisonment for each armed criminal action charge and to 20 years imprisonment on the robbery count, with all sentences to run consecutively. Petitioner submitted a *pro se* and then, after appointment of counsel, an amended motion for post-conviction relief pursuant to Missouri Supreme Court Rule 24.035. After a full hearing this motion was denied the following year, in December 1994. Petitioner then appealed his convictions and sentences and the denial of post-conviction relief. The Missouri Supreme Court affirmed in March 1997. After denial of certiorari, this proceeding was instituted on January 30, 1998.

 This ruling by the court is slightly *out of time, if the 180 day period prescribed* in 28 U.S.C. § 2266(b)(1)(A) is applicable. Although the State contends that Missouri became an "opt-in" State, as of the Summer of 1997, making applicable 28 U.S.C. §§ 2261, *et seq,* at oral argument it was tacitly acknowledged that the scheduling here has *been realistically prompt and that efforts to* obtain mandamus would probably be reserved for instances where there has been substantial processing delay. Nevertheless I would take a statutory deadline more seriously, when at all feasible, if applicable. With somewhat less care it would have been possible *to decide this case several weeks*

ago. I am convinced, however, that expedited death penalty reviews are reserved for cases in which an inmate, unlike petitioner, has received the benefit of the post-conviction assistance specified by Congress. *Bennett v. Angelone,* 92 F.3d 1336, 1342 (4th Cir.1996) (eligibility for opt-in procedures denied where petitioner had not received the benefit of certain procedures instituted in Virginia on July 1, 1992); *Wright v. Angelone,* 944 F.Supp. 460, 463 (E.D.Va.1996); *Ashmus v. Calderon,* 935 F.Supp. 1048, 1053 (N.D.Cal.1996), *aff'd* 123 F.3d 1199 (9th Cir. 1997), *rev'd on other grounds, Calderon v. Ashmus,* —— U.S. ——, 118 S.Ct. 1694, 140 L.Ed.2d 970 (1998). In *Bennett,* where appellate argument occurred in May 1996, the court gave a restricted reading to the mandate that the special capital case procedures should apply to "cases pending on or after the date of enactment of this Act" (April 24, 1996). The case apparently construes the statutory expedited procedures as being applicable under 28 U.S.C. § 2261(a) "if the provisions of subsections (b) and (c) are satisfied" not only as to the *States* seeking to opt in but also to *prisoners* who have benefitted from the legislation. *Ashmus* expressly refers to what benefit the condemned prisoner has received. 123 F.3d at 1202. So construing the legislation may be required to avoid a due process problem of retroactivity if prisoners who have not been benefitted are forced into expedited procedures designed for prisoners who have received such benefits. *Compare, Eastern Enterprises v. Apfel,* —— U.S. ——, —— — ——, 118 S.Ct. 2131, 2158–9, 141 L.Ed.2d 451 (concurring opinion), 2163 ("the potential unfairness of retroactive liability ... finds a natural home in the Due Process Clause.") (dissenting opinion) (1998). In a rare use of the concept of substantive due process, Judge Learned Hand opined that a capriciously retroactive application of a tax statute was simply "too whimsical to stand." *Frew v. Bowers,* 12 F.2d 625, 630 (2d Cir.1926) (concurring opinion). Any Congressional intent to expedite the imposition of the death penalty of Convict A because the State has increased its vigilance to provide Convict B with more adequate post-convic-

tion representation would make a "mere sport" of the reviewing process.[1]

The foregoing explains my failure to use the statutory death penalty processing of this case and perhaps may be useful to the Court of Appeals in determining appellate practice.[2]

\* \* \* \* \* \*

Petitioner advances a number of claims in support of his petition for habeas relief. He contends that his counsel was ineffective for (1) failing to *investigate* a diminished capacity defense; (2) failing to *advise* petitioner of a potential diminished capacity defense; (3) failing to investigate and present possible mitigating evidence relating to his mental condition (as affected by drugs) during the *penalty* phase of petitioner's proceedings; (4) failing to advise petitioner that he could be sentenced based upon a different theory of liability (as to one of the deaths) than that to which he pled guilty or to object during sentencing to evidence of a different theory of liability; (5) advising petitioner that he would not receive the death penalty if he pled guilty; and (6) acting under a conflict of interest. Petitioner further argues that his guilty plea was not knowing, intelligent and voluntary because he was not advised of a potential defense of diminished capacity, of the fact that he could be sentenced based upon a theory of liability different from that to which he pled guilty, or of the required mental state for first-degree murder. Petitioner also contends that his due process and Eighth Amendment rights were violated by the Missouri Supreme Court's proportionality review and when the sentencing court allegedly refused to consider relevant mitigating evidence.

### Standard of Review

Petitioner's claims are governed by 28 U.S.C. § 2254(d), as amended on April 24, 1996.[3] The statute provides that State Court determinations are entitled to deference, as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence in the State court proceeding.

28 U.S.C. § 2254(d)(1) & (2). A state court's factual findings are "presumed to be correct" and can only be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### I. Ineffective Assistance of Counsel

■■■ To successfully assert a claim of ineffective assistance of counsel, movant must demonstrate that counsel's performance was deficient as a matter of constitutional law and that the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A constitutionally deficient performance is one that falls "outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. 2052. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct; and to evaluate the conduct from counsel's perspective at the time. *Fretwell v. Norris,* 133 F.3d 621, 624 (8th Cir. 1998). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and thus the movant must overcome the presumption that, under the circumstances, the challenged action might be considered sound

---

**1.** The expedited scheduling of executions may technically be characterized as a procedural matter, but even so I believe capricious use of a "quid pro quo" policy would implicate due process concerns.

**2.** I am aware that there are, in addition, serious questions about Missouri's compliance with the opt-in procedures.

**3.** I am satisfied, moreover, that the decision adverse to petitioner here would also be made under prior law.

trial strategy. *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. "Prejudice" requires a reasonable probability that, but for counsel's errors, the proceeding would have had a different result—in this case, a sentence more lenient than the death penalty. *Id.* at 694, 104 S.Ct. 2052. A reasonable probability is one sufficient to undermine one's confidence in the outcome. *Id.* In the context of a challenged guilty plea, a defendant must show that, but for counsel's alleged errors, he would not have pleaded guilty and would insist on going to trial. *Forest v. Delo,* 52 F.3d 716, 722 (8th Cir.1995), citing *Hill v. Lockhart,* 474 U.S. 52, 58–9, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). If sufficient prejudice is not shown, the court need not decide if counsel was ineffective. *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052. As will be shown, for the most part I elect to concentrate on the issue of prejudice.

*Evidence of Petitioner's Mental Capacity*

Petitioner alleges that his trial counsel was ineffective for failing to investigate a potential diminished capacity defense based on petitioner's mental defects, organic brain damage, depression, history of chronic pain, prescription drug dependence, and impairment by LSD, alcohol and marijuana,[4] and for failing to advise petitioner about such a potential defense.[5] Petitioner contends that such an investigation would have produced helpful evidence and that he would not have pled guilty if such evidence was available. Petitioner also claims his counsel was ineffective in failing to conduct a reasonable investigation into and to present evidence of petitioners's mental defects, organic brain damage, history of chronic pain, prescription drug dependence, and impairment by LSD, alcohol and marijuana on the night of the murders as mitigating evidence at sentencing.[6]

The opinion of the Missouri Supreme Court makes a plausible but debatable showing that trial counsel needed no "further investigation" or "mental evaluation" of petitioner's "mental instability" on the night of the murders or previously. 942 S.W.2d at 376–7. The Court recited trial counsel's view that he "had no reason to pursue a mental disease or defect defense because it was inconsistent with the theory" of the defense; that is, that petitioner was outside the house and did not commit the murders. *Id.* 377. This argument fails to consider that immediately after any conviction by a jury the jury would have been expected to consider sentencing issues, including the mitigation claim based in large part on petitioner's mental condition. In fact, a showing of mental disease or defect was made at sentencing, but distinctly less impressively than in the post-conviction proceedings.

I am not comfortable with concluding that trial counsel had satisfied his constitutional responsibilities to petitioner in this regard before the sentencing proceeding. Lack of prejudice, however, is much more demonstrable, since the sentencing judge heard all the post-conviction testimony and was distinctly unimpressed.[7]

---

4. Respondent argues that petitioner's claim is partially procedurally defaulted because petitioner did not allege during his post-conviction appeal that his counsel was ineffective in failing to conduct a reasonable investigation of evidence of depression or of petitioner's use of marijuana and alcohol on the night of the murders. Because the court finds that petitioner suffered no prejudice as a result of counsel's failure to assert a diminished capacity defense, it need not determine whether these claims are procedurally barred. They were referred to in the opinion of the Missouri Supreme Court.

5. Respondent contends that this claim is procedurally barred because, although petitioner raised the claim in his post-conviction motion, he failed to appeal the ruling in his post-conviction appeal. As above, because the court finds in favor of respondent on the merits, it need not decide whether the claim is procedurally barred.

6. Respondent contends that this claim, to the extent it concerns depression and marijuana and alcohol intoxication, is also barred. Again, because of the court's determination on other grounds, the court need not address this issue.

7. Petitioner does make an argument that the sentencing judge, having committed himself to the death penalty, was psychologically unprepared to fully reconsider the issue a year later. The point is arguable but too speculative to accept. A conscientious judge could readily change his views, if impressed by new evidence, and could blame trial counsel's deficiencies for a different result. It may be noted, further, that the sentencing judge was not dealing with a local

Petitioner was given an opportunity to present evidence relating to his mental capacity at his post-conviction evidentiary hearing, and made an unusually thorough presentation. Doctors Agnew, Gelbort and Evans testified on petitioner's behalf. Dr. Agnew, a psychologist, had been treating petitioner for pain and depression at the time of the murders. Dr. Agnew testified that petitioner was "sane every time I saw him" and that there was no history of petitioner ever experiencing any psychotic symptoms from drug usage or otherwise. Appeal Tr. 278, 285. He opined that depression was petitioner's only significant mental problem. Appeal Tr. 286. Dr. Agnew acknowledged, however, that he could not make a determination about petitioner's criminal responsibility on the night of the crime. Appeal Tr. 278.

Dr. Gelbort, a clinical psychologist and neuropsychologist, testified that he spent five to seven hours in July and September 1994 performing a number of psychological tests on petitioner. Appeal Tr. 308–9, 339. He stated that the test results indicated organic brain syndrome or brain dysfunction. Appeal Tr. 315–16. He opined that petitioner is unable to think as efficiently or effectively as he had been, and is unable to exercise consistent reasonable judgment and arrive at reasonable solutions to problems. Appeal Tr. 316. Dr. Gelbort testified that petitioner's prescription drug abuse and pain have had a disrupting effect on his cognition, resulting in petitioner's failure to fully process information. Appeal Tr. 316, 321–6. Dr. Gelbort concluded from his testing that petitioner was not "in control of himself" or able to make decisions in a normal capacity on the night of the murders. Appeal Tr. 334. He testified that, although petitioner was able to understand what was happening on the night of the crime, he exercised exceedingly poor

judgment and reasoning in reacting to the situation. Appeal Tr. 342–51. Dr. Gelbort did not discuss the crime with petitioner in any detail.[8] Appeal Tr. 351.

Dr. Roswald Evans, a pharmacologist, examined petitioner in July of 1994 and concluded that he was significantly impaired on the night of the murders because of LSD usage.[9] He testified that petitioner began drinking heavily, smoking marijuana and taking LSD to control pain. Appeal Tr. 389–90. LSD usage can sometimes produce euphoria, anxiety, increased suggestibility, paranoia, and occasionally violent behavior. Appeal Tr. 396–98, 404–5. The witness testified that an LSD user may see himself committing an act but cannot control his behavior. Appeal Tr. 406. Dr. Evans opined that on the night of the murders petitioner was psychotic and that his ability to coolly deliberate, to engage in abstract reasoning and to control his actions was affected. Appeal Tr. 416. He stated that petitioner was under the influence of extreme mental or emotional disturbance at the time of the crime. Appeal Tr. 417.

The State, rather unfortunately, offered no expert rebuttal.

In summary, the medical evidence introduced at the hearing established that petitioner had a history of pain, depression and prescription drug use. The one medical expert who had treated petitioner on an ongoing basis opined that he had never seen any indication of psychosis and that he could make no determination as to petitioner's mental state at the time of the crime. The other two medical experts, though they opined that petitioner did not have a normal capacity to make reasoned decisions on the night of the murders, had examined petition-

---

crime, where the influence of public opinion might unfortunately be a factor with judges, as in Missouri, who face retention elections.

8. Dr. Gelbort's only testimony relating to petitioner's ability to remember the crime was that "I didn't ask him a whole lot about that, that night." Appeal Tr. at 351.

9. Petitioner alleges that he was dependent on prescription medication. There is contradicting evidence on this point. Dr. Gelbort's testimony

that he attributed petitioner's behavior, at least in part, to drug abuse or prescription medication overuse is contradicted by Dr. Evans' testimony that petitioner's behavior was attributable to LSD, that petitioner was under-medicated by his physicians and that petitioner did not abuse prescription drugs. Appeal Tr. 365–6, 368–70. Dr. Agnew testified that petitioner was "not psychologically prone to drug-seeking behavior." Appeal Tr. at 263.

er only briefly a considerable time after the crime occurred.[10]

The post-conviction court (which was also the sentencing court) held that Dr. Evans' and Dr. Gelbort's opinions were not entitled to significant weight. They were contradicted by petitioner's statements at the time of his plea and in the tape recording made by codefendant John Browne. Petitioner's taped statement that he decided to kill the Schepers once he realized he had been recognized indicates a motive for committing the crime and deliberation and calculation on his part at the time of the crime. Petitioner was also tape-recorded saying "[i]t didn't have to go down like that if they weren't so stupid. I couldn't believe it." *See* Appeal Tr. 343. This comment indicates petitioner's memory of the murders and his ability to reflect that something different could have happened if Randy Scheper had been cooperative. Petitioner was also recorded complaining that the killers had just missed getting more money by not committing the murders a day sooner and stating that no one would suspect him because of his broken leg.

Moreover, petitioner's behavior immediately following the murders indicates his ability to make calculated decisions. Upon returning home after the murders, petitioner carefully concealed all evidence of his involvement in the crime by cleaning the hair and blood from his belongings and arranging the burial of the murder weapons. On tape, petitioner discussed destruction of the evidence, stating "[t]hat's why I got rid of the ammo when I came back. I got rid of the ammo and gun and that badge." *See* Appeal Tr. 345.

In pleading guilty, petitioner testified that there was no doubt in his mind that he shot Randy Scheper in the back bedroom of the Scheper's house, that he hit Mrs. Scheper in the head with a pistol and that he did *not* kill Curtis Scheper. He further indicated that he testified falsely at his initial plea hearing in which the court rejected his guilty plea when he stated that he could not recall certain events that cocurred at the time of the offense. His taped statements demonstrating his memory of the events corroborate his final testimony. *See Smith v. State,* 784 S.W.2d 855, 857 (Mo.Ct.App.1990) (movant's ability to recall details of assault would have negated a defense of mindless intoxication).

The Missouri Supreme Court found that the evidence did "not suggest mental instability that requires further investigation." *Roll,* 942 S.W.2d at 377. The sentencing court went so far as to state that petitioner's counsel "was not ineffective for not wasting money to hire the services of a neuropsychologist, a pharmacologist, a psychiatrist nor any other sort of expert witness." Post–Conviction Judgment at 16. Given that the mental capacity evidence that could have been presented at trial or at sentencing was later presented in post-conviction proceedings and was rejected almost contemptuously by the sentencing court, I conclude that earlier presentation of the evidence would not have had a likely effect on petitioner's sentence.[11]

I cannot conclude that the state court would have been required to treat the evidence as substantially mitigating, given petitioner's actions during and after the crime. Petitioner's rational behavior distinguishes this case from other cases in which the presentation of mitigating mental capacity evidence may have changed the outcome of the proceeding.[12] In *Kenley v. Armontrout,* 937

---

**10.** Petitioner notes the irony of criticizing the medical evidence for being untimely when counsel's failure to prepare is a ground for relief. I have no reason to believe the Evans and Gelbort testimony would have been stronger if available before sentencing in 1993.

**11.** As previously noted, some evidence of petitioner's mental state was presented at the sentencing hearing by lay witnesses and through presentation of petitioner's medical records; the sentencing court rejected this evidence as mitigating at that time.

**12.** Dr. Gelbort testified that although petitioner would have understood what was occurring the night of the crimes and may have appeared to be in control, petitioner's foolish actions and poor judgment demonstrate mental incapacity during commission of the crimes. This can hardly be sufficient to demonstrate diminished capacity in a legal sense; otherwise psychiatric evaluations would be required in most criminal cases. *See Garrett v. State,* 554 S.W.2d 462, 465 (Mo.Ct.App. 1977) (if repeated episodes of criminal conduct were sufficient to demonstrate a mental problem, the logical conclusion that no sane person would

F.2d 1298 (8th Cir.1991), the defendant suffered mental defects almost identical to those alleged by petitioner; the defendant had, however, committed one murder, shot two bystanders, abducted two bystanders, stolen two cars, committed several assaults, and robbed four businesses in a span of several hours. He made no attempt to hide his behavior, as there were twenty-six witnesses to the crimes, including seven eyewitnesses to the murder. These "crazed" actions by someone on an inexplicable rampage are far different from this petitioner's behavior. *See also Weaver v. State,* 627 N.E.2d 1311 (Ind. App.1994) (after taking LSD, defendant exhibited erratic behavior over the course of the evening, was incapable of reading a menu and ordering in a restaurant, appeared dazed, and had attempted to kiss and then choke a female friend while calling her by the wrong name).

The general understanding about LSD among reasonably sophisticated laymen is reflected in judicial statements in *United States v. Marshall,* 908 F.2d 1312 (7th Cir. en banc 1990). Speaking for the majority, Judge Easterbrook stated that the drug may cause psychoses, "sometimes leading to suicide or violent aggression." 908 F.2d at 1320. Speaking for dissenters, Judge Posner described it as "potentially dangerous ... especially for psychotics (whom it can drive to suicide).... But many things are dangerous for psychotics. No one believes that LSD is a more dangerous drug than heroin or cocaine (particularly crack cocaine). The general view is that it is *much* less dangerous." 908 F.2d at 1334 (emphasis in the original).

A case law search for litigated incidents yields few reports of psychotic aggression attributed to LSD, conforming to the theory expressed by Dr. Evans. As noted above, one of the exceptional cases, reversing a

conviction of attempted murder, detailed an extraordinary story of "erratic behavior" which supported medical testimony that the defendant was experiencing a " 'bad trip, [an] acute psychotic reaction' " to LSD. *Weaver v. State, supra,* at 1313–14. *See also, James v. State,* 695 So.2d 1229 (Fla.1997) (affirming the death penalty but detailing bizarre conduct attributable to LSD). The evidence in this case does not conform to the pattern of proof in *Weaver* or *James.* Those cases are more like a case described in this litigation, where defendant's trial attorney had successfully obtained an acquittal based on LSD-induced psychotic behavior. Appeal Tr. 246.[13]

In fairly reviewing the entire record it may be observed that the violent conduct in this case was apparently unprecedented for petitioner, that the co-defendant who was the only other surviving eye-witness said that petitioner had seemingly lost control at the time of the murders, that trial counsel had told the family that petitioner was a "zombie" and a "time bomb" (but thereafter disclaimed the need for mental condition expertise), and that petitioner himself described his reaction to verbal back-talk by Randy Scheper (the first victim) and a possible move toward obtaining a weapon as an "electric" shock that initiated the killings. Tr. 125, 312–13, 370, 372.

Some of this testimony was quite self-serving and need not have been accepted. It is not unlike what one might expect when a robbery attempt turns into a homicide. In any event, the sentencing judge heard all the testimony, including that of the experts, and had a greater capacity to evaluate it than does a reviewing court.

Even if this were a simple appellate review of fact-finding by a trial judge I cannot assert a conviction of erroneous fact-finding that would be sufficient to reverse. Under

commit such acts would require psychiatric examinations in every case). *Cf. United States v. Massa,* 804 F.2d 1020, 1022 (8th Cir.1986) (terms "mental disease or defect" do not include abnormalities manifested only by criminal or antisocial conduct). In a general sense it may be said that no person in his right mind or exercising sound judgment would engage in a fatal mission like that under consideration. The Missouri courts and petitioner's trial attorney were

following the legal conventions in rejecting the possibility of a diminished capacity defense of such sweeping magnitude.

**13.** It may be considered somewhat odd to have judges evaluating expert testimony but that is our system, in which fact-finders may accept or reject such testimony, at least within reason.

current law it would require a view that the sentencing judge and the Missouri Supreme Court have been shown by "clear and convincing evidence" to have found the facts in a fallacious manner. After review of the entire record I cannot find material error, much less clear and convincing error. I am confident there were no *prejudicial* lapses by trial counsel when he failed to present expert testimony at sentencing.

Nor would the new evidence have likely swayed petitioner's decision to plead guilty. The record indicates that on the eve of trial petitioner told his counsel that he had committed the murders and that he wanted to plead guilty. Before that time petitioner had claimed that his involvement in the crimes was limited to waiting outside the Schepers' home while his codefendants committed the murders. Petitioner told counsel that he wanted to get the case over with and indicated during his plea hearing that he didn't want his son to have to testify against him. Counsel testified that he was reluctant for petitioner to plead guilty but that once petitioner told him his true involvement in the murders, he could not allow petitioner to testify at trial to his earlier false story. Given petitioner's determination to plead guilty and the fact that, in light of the tape recordings and the testimony of petitioner's codefendants, the diminished capacity evidence would have been painfully weak, the court cannot conclude that petitioner would have proceeded to trial if counsel had investigated further.

■ Additionally, counsel was not ineffective in failing to advise petitioner about a possible diminished capacity defense. The post-conviction court discredited petitioner's allegation that he was not so advised, finding that this contention had been fully refuted. Post-conviction Judgment at 11. The record indicates that counsel did discuss the defense with petitioner. Counsel testified that he discussed both voluntary intoxication and diminished capacity defenses. Furthermore, at petitioner's plea hearing petitioner acknowledged that he and his counsel had discussed the possible defense of mental disease or defect. Because the state court's factual determination is supported by the record, it is entitled to deference.

Even if counsel failed to advise petitioner about the defense, petitioner was not prejudiced by this failure. As stated above, there is no reasonable probability that petitioner would have decided to go to trial if the psychological evidence produced post-conviction were available to him earlier. *See Smith,* 784 S.W.2d at 858.

■ Petitioner also contends that the record indicates counsel incorrectly advised him that voluntary intoxication was not a potential defense. Missouri law does not allow admission of evidence of voluntary intoxication without psychosis for the purpose of negating a "state of mind which is an element of the offense." Mo.Rev.Stat. §§ 552.010, 552.015(8). Petitioner asserts that evidence of voluntary intoxication would have been admissible to demonstrate that petitioner was unable to deliberate at the time of the murder because deliberation, though an element of the crime of murder, is not a mental state for purposes of § 552.015. Respondent argues that deliberation is indeed a mental state. The court need not reach this issue because, even if counsel's advice was incorrect, petitioner was not prejudiced by the advice. Because petitioner did not have compelling evidence of mental incapacity, it is entirely unlikely that he would have retracted his pleas had he been aware of the expert testimony earlier.[14]

### Conflict of Interest

Petitioner contends that he was denied effective assistance of counsel because counsel had an actual financial conflict of interest

14. Although some of the facts in this case are rather less favorable to the prosecution (and some of the available testimony, particularly of a psychiatric nature, was rather less favorable to the defense) than in a case recently decided by the Circuit, the Circuit's conclusion is, in my judgment, applicable here. The Court concluded that with the available evidence, "a reasonable [fact-finder] was not about to find that [petitioner] had a diminished mental state that prevented his premeditated and deliberate perpetration of the murders...." *O'Rourke v. Endell,* 153 F.3d 560, 573 (8th Cir.1998). As in *O'Rourke,* I am confident there was no prejudice from trial counsel's failure to rely on a diminished mental capacity defense.

which adversely affected his representation. Petitioner claims that counsel failed to obtain a psychiatric or mental evaluation of petitioner because of his belief that the funds necessary to pay an expert would reduce the amount of petitioner's assets available to counsel as attorney fees. In support of this contention, petitioner asserts that counsel was aware that petitioner had limited funds and would not be able to pay the total amount of his fees. He contends that counsel's concern with being paid is demonstrated by counsel's exercise of the power of attorney to withdraw $2000 from petitioner's bank account where Veteran's Disability checks were deposited despite notice that petitioner would be responsible for repayment of any overpayment of benefits received. Petitioner further interprets a letter received from counsel discouraging representation by the public defender as an attempt to keep the conflict from being exposed post-conviction.[15] The Missouri Supreme Court held that counsel decided not to hire a mental health expert for reasons other than a lack of funds. *Roll,* 942 S.W.2d at 377.

To prevail on a conflict of interest claim, petitioner must show both an actual conflict of interest and an adverse effect on his attorney's performance. See *Nave v. Delo,* 62 F.3d 1024, 1034 (8th Cir.1995), *cert. denied,* 517 U.S. 1214, 116 S.Ct. 1837, 134 L.Ed.2d 940 (1996). There is an actual conflict of interest if, "during the course of representation, the defendants' interests do diverge with respect to a material factual or legal issue or to a course of action." *Cuyler v. Sullivan,* 446 U.S. 335, 356 n. 3, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). If a defendant demonstrates an actual conflict and a lapse in representation, prejudice is presumed.

Although a number of courts have held that conflict may arise when a client's interests are adverse to his lawyer's pecuniary interests, *see Winkler v. Keane,* 7 F.3d 304, 308 (2d Cir.1993) (contingent fee in crim-

inal case created actual conflict of interest), the majority of courts to address the issue have concluded that the failure to pay fees, without more, does not give rise to a conflict of interest. *See United States v. Taylor,* 139 F.3d 924, 932 (D.C.Cir.1998); *United States v. O'Neil,* 118 F.3d 65, 71–2 (2nd Cir.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 728, 139 L.Ed.2d 666 (1998); *United States v. DiCarlo,* 575 F.2d 952, 957 (1st Cir.1978); *United States v. Wright,* 845 F.Supp. 1041, 1073 n. 35 (D.N.J.), *aff'd,* 46 F.3d 1120 (3rd Cir.1994). Retained counsel are often required to represent clients without being paid in full. Courts have presumed that although a defendant's failure to pay may cause some divisiveness between an attorney and his client, a lawyer will subordinate his pecuniary interests and honor his primary professional responsibility to the client. *See, e.g., Taylor,* 139 F.3d at 932; *O'Neil,* 118 F.3d at 71.

Moreover, in this case there is little evidence that petitioner's lack of funds created a divergence of interests between petitioner and counsel. Counsel never encouraged petitioner to plead guilty and, on the contrary, was prepared to go trial and had actually begun the trial when petitioner pled guilty. He had reviewed lengthy police and medical records, deposed a number of witnesses, and filed almost 50 motions. There is no indication that counsel minimized the time spent on this case because he knew he would not get paid for numerous hours of preparation. The Missouri Supreme Court's decision that counsel did not fail to hire mental health experts because of a lack of funds has not been convincingly rebutted.

### Theories of Liability

Petitioner also claims that counsel was ineffective in failing to advise petitioner that he could be sentenced based upon a theory of liability different than the one to which he pled guilty or, in the alternative, in failing to object during petitioner's sentencing hearing to evidence regarding a theory of

---

**15.** The letter inaccurately infers that the Public Defender, like the prosecutor, has interests against petitioner. Counsel states in the letter that he is suspicious of the way the Public Defender seems anxious to get involved in petitioner's case. The Missouri Supreme Court deter- mined that the letter does not indicate a conflict of interest because petitioner failed to show any adverse effect from the letter, since the Public Defender timely represented him with unusual effectiveness post-conviction.

liability different from the one to which he pled guilty. Petitioner pled guilty to murdering Curtis Scheper based on an accomplice liability theory. He testified that he did not kill Curtis Scheper but that he understood he could be held accountable for the crime. At petitioner's sentencing hearing, the state presented evidence that petitioner himself killed Curtis Scheper. Petitioner concedes that he failed to raise this claim previously and that it is thus procedurally defaulted. In any event the sentencing court did not adopt a finding that petitioner had personally killed Curtis Scheper. It is clear that the death penalty was not imposed because petitioner may have killed a third person.

### Advice Regarding Punishment

■ Petitioner next asserts that trial counsel was ineffective in advising him that he would not receive the death penalty if he pled guilty. Petitioner testified otherwise in pleading guilty, however. The record from petitioner's guilty plea hearing reads as follows:

THE COURT: And finally in connection with this matter, do you understand that the ranges of punishment of the three offenses of murder in the first degree are that punishment is either life without probation or parole or the death penalty on each one of those charges. . . . ?

ROLL: Yes, your honor.

\*　　\*　　\*　　\*　　\*　　\*

THE COURT: Mr. Swingle, does the State intend to make a recommendation in this case?

MR. SWINGLE: Yes, your honor. The State intends to recommend the death penalty, your honor.

THE COURT: And Mr. McManaman, were you aware of that fact, that the State was going to make this recommendation?

MR. MCMANAMAN: Yes, sir. We understood that it was an open plea and that was a possibility.

THE COURT: An Mr. McManaman, have you discussed this fact with your client?

MR. MCMANAMAN: Yes, Gary and I have talked about it.

\*　　\*　　\*　　\*　　\*　　\*

THE COURT: Now I need to be absolutely sure of this fact. Have you in any way been led to believe that this Court would be more lenient on you if you entered a plea of guilty?

ROLL: No, I have not.

THE COURT: You understand that the full range of punishments is available to the Court and that the Court on the basis of the pre-sentence investigation, the sentencing hearing and what other factor, whatever other factors that the Court might consider would have to reach a decision in this case if I elected to accept your plea of guilty?

ROLL: Yes, your honor.

THE COURT: Do you understand that?

ROLL: Yes, I do.

THE COURT: Do you in any way hold or harbor any kind of feeling that you're entering a plea of guilty will in some way ensure you that possibly the ultimate punishment would not be imposed? Do you in any way believe that?

ROLL: No, your honor.

The record refutes petitioner's claim that he was advised he would not receive the death penalty if he pled guilty. Moreover, counsel testified at the evidentiary hearing on appeal that he did not make any promises regarding punishment. Under the circumstances, there is no reason to find petitioner as credible as counsel on this issue.[16]

■ Additionally, even if counsel did advise petitioner that he would likely receive a lighter sentence if he pled guilty, the record demonstrates that petitioner was not prejudiced by this advice. Petitioner was told that the state recommended the death penalty, and the court made clear to petitioner that it would not punish him more leniently because of his guilty plea. Petitioner was aware that

---

**16.** One may suppose the petitioner and his family may have hoped the plea would be helpful in avoiding the death penalty and that counsel may have endorsed that view. There was surely no guaranty, however, and the court's warnings were adequate to dispel false hopes.

any representations to the contrary would have been incorrect, yet he chose to proceed with his plea. *See McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir.1996) (attorney's incorrect advice that there was a ten-year mandatory minimum sentence did not prejudice defendant where record demonstrated that defendant knew that under the Sentencing Guidelines the lowest sentence he could receive was twelve and a half years). There is nothing in the record to indicate petitioner misunderstood the maximum punishment that could be assessed by the court at sentencing or that he based his decision to plead guilty on any promise as to the punishment he would receive. Therefore, petitioner has not shown that he would have proceeded to trial in the absence of the possible error.

## II. *Eddings* Issue

Petitioner's strongest argument, in the court's view, is his assertion that his sentence must be vacated because the sentencing court erred in refusing to consider his drug use on the night of the murders as a mitigating factor. In announcing its decision to impose the death sentence, the sentencing court stated:

> I have considered the aggravating circumstances, I've considered the mitigating circumstances, I've considered all the evidence which was presented at the hearing on Friday a week ago. I think in part there is an attempt to excuse whatever occurred as a result of the use of drugs, the use of lysergic acid, but on the other hand the Court and the law cannot countenance the commission of one offense as an excuse for the commission of another. And I cannot myself in this case do that.

Petitioner contends the court's use of the word "cannot" suggests that the court believed it was legally precluded from considering the evidence of drug use in mitigation.

■ The Supreme Court has made clear that a court is not free to exclude potential mitigating evidence from its consideration. *Eddings v. Oklahoma*, 455 U.S. 104, 114–15, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). The sentencing court may determine the weight to be given mitigating evidence, but may not "refuse to consider, as a matter of law, any relevant mitigating evidence." *Id.* at 114, 102 S.Ct. 869. *See also Walton v. Arizona*, 497 U.S. 639, 663, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) ("Whatever evidence bearing on the crime or the criminal the defense wishes to introduce as rendering the defendant less deserving of the death penalty must be admitted into evidence and considered by the sentencer.") The *Eddings* court set aside a death sentence where the sentencing court had used language quite similar to that used by the court in this case. *See Id.* at 109, 102 S.Ct. 869 (In imposing sentence the court stated "[n]or can the Court in following the law, in my opinion, consider the fact of this young man's violent background.").[17]

Petitioner failed to object to the court's statement at sentencing. On appeal, the Missouri Supreme Court reviewed the claim for plain error. *See State v. Roll*, 942 S.W.2d at 373 ("Since there was no objection, review is discretionary for plain error."). The court concluded that the sentencing court did not refuse to consider the mitigating evidence:

> Drug abuse may or may not be considered a mitigating circumstance, depending on the facts of the case. *State v. Hunter*, 840 S.W.2d 850, 868 (Mo. banc 1992), *cert. denied*, 509 U.S. 926, 113 S.Ct. 3047, 125 L.Ed.2d 732 (1993). Here, the trial judge's comments were "merely reflections on how he weighted the evidence of defendant's drug abuse in determining mitigating circumstances." *See Id.*

*Id.* at 374. The Court thereby determined that the sentencing court did not commit plain error:

> All of the penalty phase evidence was considered by the judge, but the evidence of

---

**17.** In this case, as in *Eddings*, there is ambiguity in what the sentencing judge said. He may have been referring here to a legal view that he lacked discretion to mitigate for illegal conduct, or simply that he could not in good conscience exercise leniency under the circumstances. As Justice O'Connor stated in her concurrence, imposition of the death penalty should not turn on an ambiguity. 455 U.S. at 119, 102 S.Ct. 869.

drug use was assigned little, if any, weight. The trial court committed no plain error.

*Id.*

■ Respondent asserts that this court should not review petitioner's claim because the Missouri Supreme Court's plain error review did not cure petitioner's procedural default. Recent Eighth Circuit case law suggests that this is not the case. Although there have been conflicting Eighth Circuit opinions on the issue of whether plain error review by a state court allows for any further review,[18] the circuit has somewhat harmonized these two lines of cases in *Sweet v. Delo,* 125 F.3d 1144, 1152–3 (8th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1197, 140 L.Ed.2d 326 (1998). In *Sweet,* the court held that where a petitioner clearly presents a claim to the state court in constitutional terms, it is appropriate for a federal court to exercise its discretion and review the claim for plain error. *Id.* Because petitioner's claim was couched as a federal issue on appeal, *see* Appeal Brief at 27–29, the court will review for plain error.

Petitioner argues that more probing review is appropriate because the Missouri Supreme court erred in limiting its consideration of this claim to plain error review. Petitioner contends that the claim was properly preserved and that, consequently, no deference should be given to the state court's opinion. Petitioner asserts that there was no opportunity or need to object at sentencing in order to preserve the issue. At oral argument, counsel stated that there is no rule that a party must object to an error committed at sentencing in order to preserve the claim, and that it would be unrealistic to expect attorneys to interrupt the sentencing court in order to object to the court's statements when imposing sentence.

■ If the Missouri Supreme Court's use of petitioner's failure to object as a procedural bar is not based on a consistent practice in Missouri, petitioner may be entitled to full review of this claim. *See Williams v. Lockhart,* 873 F.2d 1129, 1131–2 (8th Cir.1989) ("if the state procedural bar is unclear, or has been inconsistently applied … a federal habeas court might well conclude that such a rule of state law, valid though it may be for merely state law purposes, would not suffice to bar habeas review under the *Wainwright* doctrine"). If, however, the rule used by the state court has been consistently applied, the court will review for plain error only. *See Id.*

■ The court reads Missouri cases to consistently hold that a defendant must object to any infirmities in the sentencing process with the grant of allocution and that if the defendant does not do so, the matter is not preserved for appellate review. *See State v. Olney,* 954 S.W.2d 698, 700 (Mo.Ct. App.1997); *State v. Athanasiades,* 857 S.W.2d 337, 343 (Mo.Ct.App.1993); *State v. Lupo,* 676 S.W.2d 30, 32–3 (Mo.Ct.App.1984); *State v. Tate,* 657 S.W.2d 727, 729 (Mo.Ct. App.1983); *State v. Brown,* 668 S.W.2d 635, 637 (Mo.Ct.App.1984) (where allegedly improper remarks were made by the court *after* allocution had been granted, the failure to object was not treated as a waiver of potential errors); *State v. Feeler,* 634 S.W.2d 484, 487 (Mo.Ct.App.1981). In Missouri courts, allocution is "the formality of the court's inquiring of the prisoner 'whether he has any legal cause to show why judgment should not be pronounced against him.'" *State v. Pruitt,* 169 S.W.2d 399, 400 (Mo.1943).[19] Pe-

---

**18.** In *Toney v. Gammon,* 79 F.3d 693, 699 (8th Cir.1996), the Circuit Court held that properly limited plain error review does not cure a procedural default. In *Mack v. Caspari,* 92 F.3d 637, 641 (8th Cir.1996), the Eighth Circuit provided for plain error review when the Missouri courts have followed that practice.

**19.** In federal court, allocution is considered to be the point at which the court allows the defendant to speak his mind regarding the crime and the soon-to-be imposed sentence. The purpose of the right to allocution is to allow "the defendant, personally, to have the opportunity to present to the court his plea in mitigation." *Green v. United States,* 365 U.S. 301, 304, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961). I do not consider my earlier inquiry about the timeliness of sentencing to be anything more than an invitation to request a continuance. In this case the principal opportunity to address the court had already passed when the state court made the allegedly unsound remarks, *See* Tr. at 385. Because the Missouri courts have consistently applied a different definition of allocution, *see* Mo.Rev.Stat. § 546.560 ("[w]hen the defendant appears for judgment, he must be … asked whether he has any legal

titioner was granted allocution after the court made the above remarks. Consequently, he did not preserve this issue for appeal and the court may review for plain error only.

■■■■ "Under plain error review, an error not identified by a contemporaneous objection is grounds for reversal only if the error prejudices the substantial rights of a party and would result in a miscarriage of justice if left uncorrected." *Rush v. Smith,* 56 F.3d 918, 922 (8th Cir.1995) (citing *Fleming v. Harris,* 39 F.3d 905, 908 (8th Cir. 1994)). There must be a showing of "manifest injustice" before plain error relief can be granted. *Roberts v. Bowersox,* 137 F.3d 1062, 1064 (8th Cir.1998). Petitioner has not made a sufficient showing under this test because, even if the state court had committed clear error, petitioner was apparently not prejudiced thereby. As set forth in detail above, the sentencing court was presented with evidence concerning petitioner's LSD use at the evidentiary hearing and found it unpersuasive. I am convinced that if this case were remanded to the sentencing court for resentencing after consideration of all the evidence in the record, the death sentence would again be imposed.[20] Additionally, given that petitioner pled guilty to murdering two individuals and stated that he committed the killings in order to protect his identity, the court cannot conclude that imposition of the death penalty resulted in a miscarriage of justice.

### III. Guilty Plea

Petitioner alleges that his guilty plea was unknowing, unintelligent and involuntary because counsel failed to advise him (1) of a possible diminished capacity defense; (2) that he could be sentenced based on a theory of liability different from the one to which he pled guilty; and (3) of the elements of first-degree murder, particularly the element of deliberation, and defenses thereto. Petitioner's second claim, that he was not advised

that he could be sentenced based on a different theory of liability from the one to which he pled guilty, is, for the same reasons set forth with respect to the ineffective assistance of counsel claim on this topic, procedurally barred.

■■■■ Petitioner's remaining two contentions are closely related, and have essentially been exhausted in the prior discussion. He contends that counsel did not advise him of a possible diminished capacity defense based on petitioner's history of mental problems or based upon petitioner's inability to deliberate at the time of the crimes because of his voluntary intoxication and did not explain to him the element of deliberation, a requirement of first-degree murder.

■■■■ A plea may be involuntary either because the accused does not understand the nature of the constitutional protections that he is waiving or because he has such an incomplete understanding of the charge that his plea cannot stand as an intelligent admission of guilt. Without adequate notice of the nature of the charge against a defendant, or proof that the accused in fact understood the charge, the plea cannot be voluntary in this latter sense. *Henderson v. Morgan,* 426 U.S. 637, 645 n. 13, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976), citing *Smith v. O'Grady,* 312 U.S. 329, 334, 61 S.Ct. 572, 85 L.Ed. 859 (1941).

Petitioner relies on *Henderson,* asserting that the facts of this case are "similar to but much more serious" than those in *Henderson.* Petitioner's Brief at 29. In *Henderson,* the defendant was charged with first-degree murder but pled guilty in state court to second-degree murder, even though he was never formally charged with second-degree murder. Henderson later alleged that his guilty plea was involuntary because he was unaware that intent to cause death was an element of second-degree murder. The Supreme Court's review of the record disclosed that the elements of second-degree

cause to show why judgment should not be pronounced against him"), this court is bound to apply the same standard.

**20.** It would be tempting to remand for resentencing, because, unlike a jury trial that miscarries,

the sentencing judge could easily reconfirm or modify his sentence. But I do not feel authorized to do this, given the restrictions of Missouri procedural rules.

murder had never been discussed with the defendant. The Court noted that normally the record will show that counsel or the court explained the nature of the offense and that "it may be appropriate to presume that in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit." *Id.* at 647, 96 S.Ct. 2253. Because that had not happened, the Court set aside Henderson's guilty plea.

The Eighth Circuit has declined to interpret *Henderson* broadly. *See Moore v. Armontrout*, 928 F.2d 288, 292 (8th Cir.1991); *Gregory v. Solem*, 774 F.2d 309, 314–15 (8th Cir.1985). The language used in *Moore* and *Gregory* applies in this case:

> *Henderson* is easily distinguished from the facts now before us. As Justice Stevens pointed out, the facts in *Henderson* were 'unique' because the state trial judge 'found as a fact that the element of intent was not explained to the respondent.'... Here, petitioner was charged from the beginning with [first-degree murder] and the state court made a specific finding of fact that the nature of the offense was fully understood by [petitioner]. The *Henderson* presumption that counsel explained the nature of the charge to the defendant lends strong support to that finding.

*Gregory*, 774 F.2d at 315. The *Moore* court employed the same analysis in rejecting the petitioner's argument:

> During the guilty plea hearing, the court read the charges to petitioner and the prosecutor recited the factual situations surrounding the charges. Petitioner responded affirmatively when asked if he had discussed the charges with his attorney, if he was satisfied that his attorney had all the necessary facts to give adequate advice, if he had enough time to

discuss the charges with his attorney, if he had been advised of his legal rights, if he was satisfied with the services of his attorney, and if he understood the consequences of a guilty plea and the range of punishment for the crimes to which he was pleading guilty.

*Moore*, 928 F.2d at 292.

In this case, the trial court fully described to petitioner the conduct for which he was pleading guilty. Petitioner indicated that he understood that he was being charged with "knowingly" and "after deliberation" killing each of the Schepers. Combined with the presumption in favor of counsel, this convinces the court that petitioner had a sufficient understanding of the elements of first-degree murder.[21]

■■■ Such an understanding is not necessary with respect to each potential defense relinquished by a guilty plea. *United States v. Broce*, 488 U.S. 563, 573, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989). "Relinquishment derives not from any inquiry into a defendant's subjective understanding of the range of potential defenses, but from the admissions necessarily made upon entry of a voluntary plea of guilty." *Id.* Counsel's failure to provide advice may form the basis of an ineffective assistance of counsel claim, but absent such a claim it cannot serve as the predicate for setting aside a valid plea. *Id.*[22]

The state court determined that counsel did in fact discuss the diminished capacity defense with petitioner. However, even if this were not the case, petitioner would not be entitled to set aside his plea. Petitioner's admissions in pleading guilty indicated that he had committed, himself or by virtue of accomplice responsibility, three first-degree murders, in two of which he acknowledged that, after at least brief deliberation, he personally struck death-dealing blows, intending to cause death. The available evidence sup-

---

**21.** The court notes that none of the expert witnesses opined that petitioner was not capable of rendering a knowing and intelligent guilty plea.

**22.** Petitioner relies on the Eighth Circuit's recent decision in *Wilkins v. Bowersox*, 145 F.3d 1006 (8th Cir.1998), in which the court set aside the petitioner's guilty plea because the court had not discussed possible defenses or lesser included

offenses. *Wilkins* is distinguishable from this case because there was uncontroverted evidence from several doctors that petitioner, a mentally disturbed 16 year-old who had waived his right to counsel and requested the death penalty, was mentally unable to intelligently or voluntarily waive his right to counsel or decide to plead guilty.

porting this version could fairly be considered overwhelming. No understanding of potential theoretical defenses was necessary. Because petitioner has not demonstrated that his counsel was ineffective or that he was prejudiced by an alleged failure to advise him of hypothetical defenses, his guilty plea remains valid.[23]

## IV. Proportionality Review

Petitioner asserts that the Missouri Supreme Court failed to conduct a meaningful appellate review of the validity and proportionality of his death sentence, thereby violating his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. He contends that on appeal the court merely "rubber-stamped" his conviction and sentence.

■ Missouri law, Mo.Rev.Stat. § 565.035, mandates that the Missouri Supreme Court determine whether a sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, whether the evidence supports the finding of a statutory aggravating circumstance, and whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. Although the Eighth Amendment does not require courts to compare the sentences imposed in similar cases, *Pulley v. Harris*, 465 U.S. 37, 48–51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), where a state creates a right the Fourteenth Amendment entitles defendants to procedures to ensure that the right is not arbitrarily denied. *Wolff v. McDonnell*, 418 U.S. 539, 557, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

■ Here, the Missouri Supreme Court did conduct a review of petitioner's sentence and concluded that the sentence was not imposed under the influence of any arbitrary factor, that sufficient evidence supported the sentencing court's finding of aggravating circumstances, and that the death penalty was not disproportionate to the crimes for which petitioner was convicted. The Eighth Circuit has held that, as long as a proportionality review was completed, the court need not look behind the state court's conclusion or consider whether the state court misinterpreted the proportionality review statute. *Bannister v. Delo*, 100 F.3d 610, 627 (8th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 2526, 138 L.Ed.2d 1026 (1997); *Six v. Delo*, 94 F.3d 469, 478 (8th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 2418, 138 L.Ed.2d 182 (1997).

Petitioner asserts that, although the court is not required to further review the state court's proportionality determination, it may and should do so in this case to prevent arbitrariness.[24] Petitioner argues that there is evidence of arbitrary imposition of the death sentence in this case because the court gave no consideration to the "substantial mitigating factors"—petitioner's lack of criminal history and his various mental problems including LSD intoxication on the night of the crime—and that if the Supreme Court truly compared the crime to similar cases it would have reduced petitioner's sentence. The court has already concluded that the Missouri Supreme Court's finding that the evidence of petitioner's alleged mental defects was not particularly persuasive in mitigation was not unreasonable. The Missouri Supreme Court compared this case with a large number of capital punishment cases in which the aggravating circumstances were similar. This court does not believe another extensive review is necessary.[25]

---

23. *See also* n. 14. *supra*.

24. The court notes that the Eighth Circuit has, on at least one occasion, stated that the court *"cannot* look behind the Missouri Supreme Court's conclusion" regarding proportionality. *Williams v. Delo*, 82 F.3d 781, 784 (8th Cir. 1996). (Emphasis added)

25. To the extent it adds legitimacy to the sentence, I do note that as long as the death penalty exists in Missouri, the case at bar would seem to be one which would typically qualify. Multiple murders of innocent people who have given no real cause for antagonism, let alone murder, probably invite capital punishment. Short of a frenzied "bad trip" with drugs there were few grounds for leniency here. I agree with the sentencing judge that the proof falls somewhat short of demonstrating such a drug-induced psychotic episode. Another mitigating argument comes to mind. Alleged medical malpractice resulted in petitioner's suffering from chronic, excruciating pain from nerve damage. *Roll v. United States*, 548 F.Supp. 97 (E.D.Mo.1982) (claim time barred). To the extent the murders were drug related (as seems probable) the petitioner's taste for and dependence on drugs was

For the foregoing reasons, it is hereby

ORDERED that petitioner's petition for writ of habeas corpus is DENIED. The Clerk is directed to enter judgment in favor of respondent.

The stay of execution is CONTINUED pending appeal, if notice of appeal is timely filed.

apparently acquired through narcotic self-medication. I agree with the Missouri judges, however, that even this theory tending to mitigate culpability would not remove the case very far from the heartland of capital punishment cases.